UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JOHN DOE,<br><br>    Plaintiff,<br><br> -against-<br><br>NEW YORK UNIVERSITY, CRAIG JOLLEY, SAMUEL HODGE, COLLEEN M. MAEDER, MATTHEW SHEPARD, MARY SIGNOR, JACQUELINE CORNELL, JASMINE WADE, DAISY TOMASELLI, JEFFREY METZLER, and JOHN DOES 1 through 10,<br><br>    Defendants. | Case No.: 1:19-cv-00744 (ALC)<br><br>**AMENDED COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff, John Doe[1] ("Plaintiff" or "John Doe"), by and through his undersigned counsel, BARTON LLP, for his Amended Complaint against Defendants, New York University ("NYU"), Craig Jolley ("Jolley"), Samuel Hodge ("Hodge"), Colleen M. Maeder ("Maeder"), Matthew Shepard ("Shepard"), Mary Signor ("Signor"), Jacqueline Cornell ("Cornell"), Jasmine Wade ("Wade"), Daisy Tomaselli ("Tomaselli"), Jeffrey Metzler ("Metzler"), and John Does 1 through 10 (collectively, the "NYU Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1.  Plaintiff John Doe brings this action against Defendant NYU and individually against NYU officials, Defendants Jolley, Maeder, Signor, and Metzler, and NYU Title IX

---

[1] Contemporaneously with the filing of the original Complaint on January 25, 2019 (ECF Doc. No. 2), Plaintiff filed a Motion for Permission to Proceed under a Pseudonym seeking permission of the Court to proceed anonymously given the extremely sensitive and private nature of the matters alleged herein. Plaintiff's Motion was granted. (*See* ECF Doc. No. 4.) Accordingly, Plaintiff is referred to herein as "John Doe," the female complainant in the underlying student disciplinary proceeding at NYU as "Jane Roe," and to various student witnesses by initials. NYU is fully aware of the actual identities of the students.

Investigators, Defendants Hodge, Shepard, Cornell, Wade, Tomaselli, and John Does 1 through 10, based upon their violations of John Doe's civil rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX"), the New York State Human Rights Law, New York Executive Law § 296, *et seq.* (the "NYSHRL"), and other state and local laws.

2.      The NYU Defendants discriminated against John Doe on the basis of his gender and ethnicity throughout their investigation and selectively enforced NYU's Sexual Misconduct, Relationship Violence, and Stalking Policy (the "NYU Policy") and NYU's procedures for "Reporting, Investigating, and Resolving Sexual Misconduct, Relationship Violence, and Stalking Complaints Against Students," effective August 25, 2017 (the "NYU Procedures") against Plaintiff in a concerted effort to find him guilty of a sexual assault in the face of evidence to the contrary.

3.      As set forth in detail below, Defendants NYU, the NYU Officials, and NYU's Title IX Investigators, among others, immediately presumed that, as the male, John Doe was guilty of an alleged sexual assault of Jane Roe on the basis of his sex when Jane Roe claimed on or about February 18, 2018 that John Doe sexually assaulted her almost one year earlier on the night of March 17, 2017 by having sexual intercourse with her when she was allegedly too intoxicated to give consent.

4.      Due to their gender and ethnicity biases, the NYU Defendants failed to collect, disregarded or simply ignored highly relevant exculpatory evidence.  The NYU Defendants also decided not to interview witnesses that had been identified to them at the outset of their investigation and whom ultimately had information that would wholly contradict Jane Roe's accusations against John Doe and her account of an alleged incident. The only possible explanation for their failure in this regard is a pervasive gender bias against males accused of

sexual assaults by female students, and a bias against John Doe, an Asian American, in favor of Jane Roe, a white female.

5.      Following a flawed and wholly biased investigation, Defendant NYU and the NYU Officials proceeded to hold a fatally flawed disciplinary hearing before Defendant Jolley as an appointed adjudicator with a predetermined outcome.   After a biased and unfair hearing, Defendant Jolley issued a decision stating that John Doe had sex with Jane Roe while she was too incapacitated to give consent and thus was guilty of sexual misconduct under the NYU Policy.   Demonstrating their continuing bias, the NYU Defendants immediately suspended John Doe and subjected him to other harsh and unwarranted disciplinary action on the basis of Defendant Jolley's biased and erroneous decision.

6.      As a result, Plaintiff was forced to appeal Defendant Jolley's decision to a panel of three members of NYU's faculty who were unaffiliated with the investigation of Plaintiff's alleged sexual misconduct (the "Appeal Panel").   Upon review of the record of the NYU Defendants' investigation and the disciplinary hearing, the Appeal Panel determined that Defendant Jolley's decision finding that Plaintiff was guilty of sexual misconduct by preponderance of the evidence was unwarranted and directed the NYU Defendants to conduct further investigation.   The Appeal Panel identified specific witnesses by name that should have been interviewed in the pre-hearing investigation because they were likely to, and ultimately did, have relevant exculpatory information.

7.      Further investigation by the NYU Defendants resulted in additional evidence disproving Jane Roe's allegation that she was sexually assaulted by John Doe.   The additional evidence further revealed that Jane Roe had attempted to tamper with the statements of at least two witnesses to fit her narrative of incapacitation.   Incredibly, however, the NYU Title IX

Investigators concluded for the *second time* that there was sufficient evidence to proceed to a disciplinary hearing.   Without any consultation with Plaintiff or his counsel, the NYU Defendants decided to hold a second, *de novo,* disciplinary hearing before an independent adjudicator selected by the NYU Defendants, former judge Jane Cutler Greenspan ("Judge Greenspan").   After holding a second, *de novo,* disciplinary hearing, Judge Greenspan concluded that there never was sufficient evidence that John Doe sexually assaulted Jane Roe and thus he was found not to be guilty of any misconduct.

8.      Plainly, the NYU Defendants' actions were motivated by their desire to find Mr. Doe guilty of sexual assault at all costs because of Mr. Doe's gender and ethnicity as an alleged aggressor in violation of his Title IX rights and because of enormous pressure on NYU to hold male students accountable for sexual assault.   As a result, Plaintiff has sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, damage to his academic performance, interruptions in his academic and social well-being at college, economic injuries, reputational injuries and other direct and consequential damages.   Plaintiff also has incurred, and will continue to incur, costs for ongoing medical and psychological treatment.   Additionally, Plaintiff has incurred substantial legal fees and other costs in connection with the NYU investigations and disciplinary proceedings.   As the prevailing party of the disciplinary proceedings against him, Plaintiff is entitled to recover all attorneys' fees and costs on his Title IX claim against Defendant NYU.

## PARTIES

9.      John Doe is a natural person and has been an undergraduate student at NYU since August 2016.   He left educational opportunities in China, for the opportunity to attend NYU's

4

prestigious Tisch School of the Arts ("Tisch") and study film.  He is currently in his junior year, and after this spring semester has only two semesters left to matriculate as an NYU graduate.

10.     Upon information and belief, at all times relevant to this Complaint, Defendant NYU, was and is a private, not-for-profit New York Education Corporation, located and operated in New York, New York.

11.     Upon information and belief, at all times relevant to this Complaint, Defendant NYU, was and continues to be a recipient of federal funding.

12.      Upon information and belief, at all times relevant to this Complaint, Defendant Craig Jolley, J.D., M.A. was, and remains, an NYU official with the title Director of the Office of Student Conduct and Community Standards (the "OSC") at NYU.

13.     As alleged herein, Defendant Jolley participated in the discriminatory conduct at issue.  Among other things, he carried out his duties as Director of the OSC and appointed Adjudicator of disciplinary proceedings against John Doe in a biased manner and plainly discriminated against John Doe on the basis of his gender and ethnicity.

14.     Defendant Jolley also supervised other employees at NYU who engaged in discriminatory conduct against John Doe and did nothing to stop it.

15.     Defendant Jolley aided, abetted, incited, compelled and/or coerced others to discriminate against John Doe on the basis of his sex in violation of New York State and local law.

16.     Upon information and belief, at all times relevant to this Complaint, Defendant Mary Signor ("Signor") is, and remains, an NYU Official with the title Assistant Vice President, OEO & Title IX Coordinator in NYU's Office of Equal Opportunity (the "OEO").

17.     As alleged herein, Defendant Signor participated in the discriminatory conduct at issue.  Among other things, she carried out her duties as Title IX Coordinator in NYU's OEO in a biased manner and plainly discriminated against John Doe on the basis of his gender.

18.     Defendant Signor supervised other employees at NYU who engaged in discriminatory conduct against John Doe and did nothing to stop it.

19.     Defendant Signor aided, abetted, incited, compelled and/or coerced others to discriminate against John Doe on the basis of his sex in violation of New York State and local law.

20.     Upon information and belief, at all times relevant to this Complaint, Defendant Mathew Shepard, B.A., M.Ed. ("Shepard") is, and remains, an NYU Official with the title Assistant Director for Student Conduct and Operations for NYU's Office of Student Conduct and Community Standards.

21.     As alleged herein, Defendant Shepard participated in the discriminatory conduct at issue.  Among other things, he carried out his duties as Assistant Director for Student Conduct and Operations for NYU's OSC in a biased manner and plainly discriminated against John Doe on the basis of his gender.

22.     Defendant Shepard supervised other employees at NYU who engaged in discriminatory conduct against John Doe and did nothing to stop it.

23.     Defendant Shepard aided, abetted, incited, compelled and/or coerced others to discriminate against John Doe on the basis of his sex in violation of New York State and local law.

24.     Upon information and belief, at all times relevant to this Complaint, Defendant Jeffrey Metzler, Esq. ("Metzler") is, and remains, an NYU official with the title Associate General Counsel in the Office of the General Counsel of NYU.

25.     As alleged herein, Defendant Metzler participated in the discriminatory conduct at issue.  Among other things, he carried out his duties as legal advisor to Defendant Jolley as Adjudicator and other NYU Officials in a biased manner and plainly discriminated against John Doe on the basis of his gender.

26.     Defendant Metzler supervised other employees at NYU who engaged in discriminatory conduct against John Doe and did nothing to stop it.

27.     Defendant Metzler aided, abetted, incited, compelled and/or coerced others to discriminate against John Doe on the basis of his sex in violation of New York State and local law.

28.     Upon information and belief, at all times relevant to this Complaint, Collen M. Maeder, B.A., M.S. ("Maeder") is, and remains, an NYU official with the title the Assistant Director for Student Conduct and Conflict Resolution for NYU's OSC.

29.     As alleged herein, Defendant Maeder participated in the discriminatory conduct at issue.  Among other things, she carried out her duties as Assistant Director for Student Conduct and Conflict Resolution for NYU's OSC in a biased manner and plainly discriminated against John Doe on the basis of his gender.

30.     Defendant Maeder supervised other employees at NYU who engaged in discriminatory conduct against John Doe and did nothing to stop it.

31.     Defendant Maeder aided, abetted, incited, compelled and/or coerced others to discriminate against John Doe on the basis of his sex in violation of New York State and local law.

32.     Upon information and belief, at all times relevant to this Complaint, Samuel Hodge ("Hodge") is, and remains, a Title IX Investigator for NYU's Office of Equal Opportunity.

33.     As alleged herein, Defendant Hodge participated in the discriminatory conduct at issue.  Among other things, he carried out his duties as a Title IX Investigator in a biased manner and plainly discriminated against John Doe on the basis of his gender.

34.     Defendant Hodge supervised other employees at NYU who engaged in discriminatory conduct against John Doe and did nothing to stop it.

35.     Defendant Hodge aided, abetted, incited, compelled and/or coerced others to discriminate against John Doe on the basis of his sex in violation of New York State and local law.

36.     Upon information and belief, at all times relevant to this Complaint, Daisy Tomaselli ("Tomaselli") is, and remains, an Equal Employment Opportunity and an Investigative Assistant for NYU's Office of Equal Opportunity.

37.     As alleged herein, Defendant Tomaselli participated in the discriminatory conduct at issue.  Among other things, she carried out her duties as a Title IX Investigative Assistant in a biased manner and plainly discriminated against John Doe on the basis of his gender.

38.     Defendant Tomaselli supervised other employees at NYU who engaged in discriminatory conduct against John Doe and did nothing to stop it.

39.     Defendant Tomaselli also aided, abetted, incited, compelled and/or coerced others to discriminate against John Doe on the basis of his sex in violation of New York State and local law.

40.     Upon information and belief, at all times relevant to this Complaint, Defendant Jacqueline Cornell ("Cornell") is, and remains, a Title IX Investigator for NYU's Office of Equal Opportunity.

41.     As alleged herein, Defendant Cornell participated in the discriminatory conduct at issue.  Among other things, she carried out her duties as a Title IX Investigator in a biased manner and plainly discriminated against John Doe on the basis of his gender.

42.     Defendant Tomaselli aided, abetted, incited, compelled and/or coerced others to discriminate against John Doe on the basis of his sex in violation of New York State and local law.

43.     Upon information and belief, at all times relevant to this Complaint, Defendant Jasmine Wade ("Wade") is, and remains, a Title IX Investigator for NYU's Office of Equal Opportunity.

44.     As alleged herein, Defendant Wade participated in the discriminatory conduct at issue.  Among other things, she carried out his duties as a Title IX Investigator in a biased manner and plainly discriminated against John Doe on the basis of his gender.

45.     Defendant Wade supervised other employees at NYU who engaged in discriminatory conduct against John Doe and did nothing to stop it.

46.     Defendant Wade aided, abetted, incited, compelled and/or coerced others to discriminate against John Doe on the basis of his sex in violation of New York State and local law.

47.     Upon information and belief, other officials, employees and/or agents of NYU, herein identified as "John Does 1 to 10" and to be identified in discovery, participated in the discriminatory conduct at issue and/or supervised other employees at NYU who engaged in discriminatory conduct against John Doe and did nothing to stop it and/or aided, abetted, incited, compelled and/or coerced others to discriminate against John Doe on the basis of his sex in violation of New York State and local law.

## JURISDICTION AND VENUE

48.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction on the basis of Plaintiff's claim pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681.

49.     The Court has personal jurisdiction over the NYU Defendants on the grounds that NYU, the NYU Officials and the NYU Title IX Investigators live and/or work in New York City.

50.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391 because NYU is considered to reside in this judicial district, *i.e.*, New York County, New York, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

51.     The amount in controversy in this case is in excess of the jurisdictional amount of $75,000.00.

## FACTUAL BACKGROUND

### A.     The Alleged Incident

52.     John Doe and Jane Roe are both students at NYU.  John Doe studies film at Tisch. Jane Roe is an acting and drama student at Tisch.  They met in 2016, during the fall semester of their freshman year while residing on the same floor of their NYU dormitory called Third North

Residence Hall ("Third North").   Thereafter, they would talk and message one another and socialize on occasion.

53.     On March 17, 2017, Jane Roe participated in making a short film.  Jane Roe claims that after filming, at around 9:00 p.m., she and her friend from out of town, E.G., who is not a student at NYU, went to a party in the dorm room of another student, R.A.  By Jane Roe's own account to NYU's Title IX investigators, she was "upset about something" on the day of the Alleged Incident and was drinking.  Further investigation revealed that Jane Roe expressed feelings of rejection by a castmate, N.W., who was at the party pursuing another girl, C.G. While at the party, Jane Roe texted her male friend, W.C., at 11:30 p.m. stating that "'*she felt fat and not pretty*' and that she was '*ok, but wanted to kiss someone right now.*'"

54.     Jane Roe claims that, after she messaged W.C., she walked to meet him in the courtyard of the dorm.  She then walked back to W.C.'s dorm room, spoke with him for about 40 minutes about another girl, and then allegedly went back to the party in R.A.'s dorm room.  Jane Roe claims that she was escorted home from R.A.'s dorm room by R.A. and her girlfriend, E.G.

55.     The record contains evidence that during the course of the night, at 10:44 p.m., Jane Roe sent a text to John Doe via the Facebook Messenger application stating "*Hey*!" According to statements provided to NYU by Jane Roe's friend, E.G., Jane Roe thought John Doe was "cute" and "expressed an interest in him" which E.G. "inferred to be romantic in nature."  John Doe did not immediately respond to that text as he was entertaining his friend from out of town, W.M., at a bar and a friend's off-campus apartment over the course of the evening.

56.     Later that night, at approximately 2:00 a.m. on March 18, 2017, John Doe and W.M. arrived back to the dormitory from an off-campus apartment and encountered Jane Roe in

the dorm elevator.   At that time, John Doe observed Jane Roe to be "normal, fully conscious, and able" and that there was "nothing unusual about how she was speaking," such as slurring her words and she was walking unassisted and without stumbling.  As John Doe and Jane Roe parted at the elevator, they mutually expressed the desire to "hangout sometime."

57.     At 2:37 a.m., John Doe responded to Jane Roe's text from earlier that night and said "*Hey*" with a smiling emoji.  The ensuing back and forth text message conversation was coherent and properly punctuated.  For example, when John Doe asked what she was doing, Jane Roe said "*Just sitting in my room.*"  Then, when John Doe asked her how her night was she said "*It was so good!  Yours?*"  In response to John Doe stating that there was some drama between his friends, Jane Roe said "*Ohhhh shit I hate drama.  What kind of drama?*"  John Doe texted: "*Wanna go to the study room*" and Jane Roe stated:  "*Haha sure.*"  Critically, Jane Roe described her level of intoxication at that time:  "*I'm drunkish.*"  (Emphasis supplied).  Jane Roe then left her room to meet John Doe in the study room.  E.G., who was staying overnight in Jane Roe's dorm room that evening, later recalled to NYU's Title IX Investigators that Jane Roe did not display any behavior that would have prompted her to be concerned for Jane Roe as she left the dorm room.

58.     After brief flirtatious chatter, Jane Roe and John Doe engaged in consensual sexual activity.  According to Jane Roe, after she met John Doe in the study room, they made out and she voluntarily performed oral sex on him.  She then claims that John Doe "indicated that he wanted to engage in sexual intercourse" and used "coercive" language to encourage her, recalling specifically that John Doe said "come on" and "it's fine, no one will come in the study room."  Jane Roe also recalled that John Doe did not "threaten her or physically force her to engage in intercourse."  Jane Roe also recalled that John Doe asked during intercourse if she was

on birth control and she said, "*yes, but [she] told him not to come inside [her]*."  She also recalled rearranging her cloths and leaving the study room.  Therefore, although Jane Roe claims to have "blacked out" and "come to" during intercourse, by her own account, she recalls specific conversation and events (including voluntary sexual activity) before, during, and after having intercourse with John Doe, thus indicating that she was not in any state even close to incapacitation.

59.     According to John Doe, when he got to the study room, he and Jane Roe kissed for approximately five to ten minutes.  Jane Roe then moved her hand to his groin and he moved his hand to her breasts.  He then moved his hand under her skirt and Jane Roe consented to digital penetration.  She also consented to perform oral sex on John Doe.  John Doe then asked Jane Roe if she wanted to engage in intercourse and if she wanted to go to her room, his room, or stay in the study hall.  John Doe said that Jane Roe responded that he should "just f*** me here."  John Doe said they engaged in intercourse for five to six minutes.  John Doe did not observe Jane Roe to be drunk at the time of the Alleged Incident; he did not smell or taste alcohol on her.  After the encounter, John Doe said he and Jane Roe left the study room and went to their separate rooms.  John Doe said Jane Roe again walked without the need for assistance and without stumbling or any other indication that she was overly intoxicated, much less incapacitated.

60.     Several days later, on March 27, 2018, John Doe contacted Jane Roe to ask if she was upset by the encounter in the study room.  Jane Roe responded that she felt like John Doe had taken advantage of her.  John Doe was shocked to receive such a message because Jane Roe's statements and actions on the evening in question unequivocally indicated to him that they had a mutual desire to engage in prolonged sexual activity.  Indeed, John Doe responded by text

that he "had the impression that it was consensual" but nonetheless, he apologized that she was perceiving her feelings that way, understanding that she may have been embarrassed, as was he, that they had engaged in prolonged sexual activity in a very public space in their dorm.

**B.     NYU's Sexual Misconduct, Relationship, Violence, and Stalking Policy**

61.     The "Sexual Misconduct, Relationship Violence, and Stalking Policy" governed the disciplinary proceedings relating to the Alleged Incident.

62.     Upon information and belief, the NYU Policy in effect at the time of the Alleged Incident was issued by NYU's Deputy Chief of Staff, the Office of the President, and Senior Vice President for Student Affairs on September 30, 2015 and was subsequently amended on October 13, 2016 (hereinafter the "NYU Policy").

63.     The NYU Policy is and was publicly available on NYU's website at all relevant times.

64.     The "Responsible Officers" for the NYU Policy are the Director of the Office of Student Conduct and Community Standards ("OSC") and NYU's Title IX Coordinator.  At all relevant times, Defendant Jolley was the Director of the OSC at NYU and Defendant Signor was NYU's Title IX Investigator.

65.     The NYU Policy defines "Non-Consensual Intercourse" as "having or attempting to have sexual intercourse with another individual (i) by force, threat of force, or coercive conduct; (ii) without affirmative consent; or (iii) where that individual is incapacitated."  § VII (B)(1).  "Affirmative consent" is defined as "a knowing, voluntary, and mutual decision among all participants to engage in sexual activity . . . can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in sexual activity."  § VIII(A).

66.    By the Policy, "[i]n evaluating whether affirmative consent was given, consideration will be given to the totality of circumstances, including but not limited to the extent to which a Complainant affirmatively gives words or actions indicating a willingness to engage in sexual activity; whether a reasonable person in the Respondent's position would have understood such person's words and acts as an expression of consent; and whether there are any circumstances, known or reasonably apparent to the Respondent, demonstrating an incapacity to consent." *Id.*

67.    Additionally, the NYU Policy defines "incapacitation" in relevant part as follows:

> An individual who is incapacitated lacks the ability to knowingly choose to participate in sexual activity or make informed, rational judgments and thus cannot consent to sexual activity.  ***Incapacitation is defined as the inability, temporarily or permanently, to give consent because an individual is mentally and/or physically helpless, being involuntarily restrained, asleep, unconscious, or unaware that sexual activity is occurring***.  Mentally helpless means a person is rendered temporarily incapable of appraising or controlling one's own conduct. Physically helpless means a person is physically unable to communicate unwillingness to an act.
>
> ***Where alcohol or other drugs are involved, incapacitation is a state beyond drunkenness or intoxication***.  The impact of alcohol and other drugs varies from person to person; however, warning signs that a person may be approaching incapacitation may include slurred or incomprehensible speech, vomiting, unsteady gait, combativeness, or emotional volatility.  Evaluating incapacitation also requires an assessment of whether a Respondent knew or should have been aware of the Complainant's incapacitation based on objectively and reasonably apparent indications of impairment when viewed from the perspective of a sober, reasonable person in Respondent's position . . .

§ VIII (C) (emphasis supplied).

68.    The NYU Policy contains a "Students' Bill of Rights" at Section X.  As set forth therein, "all students have the right to . . . participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be hearing (heard?).  *Id.*, § X (4).

15

69.     By conducting biased and unfair investigations and disciplinary proceedings, as described herein, Defendant NYU repeatedly breached its obligations to John Doe under Section X of the NYU Policy.

**C.     The NYU Procedures for "Reporting, Investigating, and Resolving Sexual Misconduct, Relationship Violence, and Stalking Complaints Against Students"**

70.     In addition to the NYU Policy, NYU has policies and procedures called the "Reporting, Investigating, and Resolving Sexual Misconduct, Relationship Violence, and Stalking Complaints Against Students," effective August 25, 2017, hereinafter referred to as "NYU Procedures."    As stated therein, "NYU's procedures for reporting, investigating, and resolving violations of the Policy where an incident involving a Student as a Respondent has been or will be reported to NYU" are contained in the NYU Procedures.  NYU Procedures, p. 1.

71.     The NYU Procedures were in effect at all relevant times and publicly available on NYU's website.

72.     According to the NYU Procedures, upon receiving Jane Roe's complaint, Defendants were required to "take immediate and appropriate steps to investigate or otherwise determine what happened and work to resolve the matter promptly and equitably."   NYU Procedures, § I.

73.     As detailed below, Defendants failed to "take immediate and appropriate steps to investigate or otherwise determined what happened" after receiving Jane Roe's complaint as required by Section I of the NYU Procedures.  *Id.*    To the contrary, Defendants conducted wholly biased investigations and failed to talk to multiple witnesses who had information contradicting Jane Roe's account of events and which was favorable to John Doe.

74.     Also, in violation of Section I of the NYU Procedures, Defendants failed to "work to resolve the matter promptly and equitably."  *Id.*   To the contrary, Plaintiff was subjected to

biased investigations that lasted several months; a biased disciplinary hearing that resulted in an erroneous outcome; an appeal of the erroneous outcome; more investigation after appeal, a second *de novo* disciplinary hearing despite the fact that the additional witnesses that were interviewed also contradicted Jane Roe's account of events; and another appeal by Jane Roe.  In all, the entire process lasted over a year from February 18, 2018 through March 6, 2019.

**D.**   **"The First NYU Investigation"**

75.    According to Defendant Hodge, Jane Roe first lodged a complaint nearly one year after the Alleged Incident, on or about February 21, 2018.

76.    By Jane Roe's account, in the intervening time between the Alleged Incident and her reporting of it, she developed a new group of friends and was empowered to come forward with her allegation.

77.    The initial investigation of Jane Roe's complaint was conducted by Defendants Hodge, Cornell, and Tomaselli, who had been appointed as the Title IX Investigators on behalf of NYU for Jane Roe's complaint. According to the NYU Procedures, Defendants Cornell, Hodge and Tomaselli were required "to conduct a prompt, thorough, and impartial Investigation of the report in the manner the Investigator deems appropriate." *Id.,* § III(A).   They failed to do so.

78.    On March 19, 2018, Defendants Cornell, Hodge, and Tomaselli interviewed Jane Roe who was accompanied by a "support person" named H.P.  This was the only interview of Jane Roe conducted by the Title IX Investigators prior to issuing their initial Investigation Summary Report on June 11, 2018 (the "First Investigation Summary Report").

79.    As summarized in the First Investigation Summary Report, Jane Roe advised Defendants Cornell, Hodge and Tomaselli that she recalled voluntarily performing oral sex on

John Doe immediately prior to sexual intercourse.  By her own statement, she recalled a specific conversation with John Doe as they were engaging in intercourse about birth control and directing John Doe "not to come inside her," which he did not.  Also, according to her statements to Defendants Cornell, Hodge and Tomaselli during her first interview, she expressly recalled events immediately prior to and following intercourse.

80.     By any objective view of the statements that Jane Roe gave to Defendants Cornell, Hodge and Tomaselli, she was not "incapacitated" as that term is defined by the NYU Policy to mean "***involuntarily restrained, asleep, unconscious, or unaware that sexual activity is occurring***."  NYU Policy, § VIII (C) (emphasis supplied).

81.     Nonetheless, on March 22, 2018, John Doe received an email from NYU's Title IX Coordinator, Defendant Signor, asking him to meet to discuss "allegations that [he] may have engaged in prohibited misconduct in violation" of the NYU Policy.  In violation of Title IX, and the NYU Procedures, NYU's March 22nd notice to John Doe did not provide any details about the alleged misconduct such as the "location and factual allegations concerning the violation," or cite the section of the Policy that John Doe allegedly violated.  *See* NYU Procedure at § IV(A)(3).  A subsequent April 9, 2018 email from NYU to John Doe failed to cure all of these defects.

82.     Defendants Cornell, Hodge and Tomaselli conducted two separate interviews of John Doe on April 13 and May 3, 2018.  Despite the fact that both Jane Roe and John Doe identified numerous witnesses that had relevant information to the Alleged Incident, Defendants Cornell, Hodge and Tomaselli did not interview a single witness prior to issuing the First Investigation Summary Report on June 11, 2018.

83.     In their First Investigation Summary Report, Defendants Cornell, Hodge and Tomaselli determined that there was sufficient evidence to be considered by an adjudicator as to whether John Doe violated NYU Policy pursuant to Section H (1) of the NYU Procedures and hold a "Sexual Misconduct Hearing."

84.     Defendants Cornell, Hodge and Tomaselli's "determination" of "sufficient evidence" in the First Investigation Summary Report was based upon nothing more than Jane Roe's false accusations against John Doe and motivated by the NYU Defendants' bias against John Roe as a male and to find him guilty of a sexual assault at all costs.

85.     Additionally, Defendants Cornell, Hodge and Tomaselli's "determination" of "sufficient evidence" to to be considered by an adjudicator as to whether John Doe violated NYU Policy pursuant to Section H (1) of the NYU Procedures and hold a "Sexual Misconduct Hearing" was a breach of the NYU Procedures including, but not limited to, Section III(A) which required them to "conduct a prompt, thorough, and impartial Investigation" of Jane Roe's allegation.

86.     NYU also breached Section III (B) of the NYU Procedures which expressly states that the Title IX Investigators were required to "notify and meet with all parties separately (e.g., the Complainant, the Respondent, and identified witnesses) and also will gather other evidence and information relevant to the determination as to whether or not a Policy violation has occurred."   Despite this requirement, and due to their bias against John Doe as the accused male, NYU's Title IX Investigators, Hodge, Tomaselli, Cornell and Wade, purposely did not seek out and interview numerous witnesses identified by Jane Roe and John Doe themselves in their initial interviews by the Title IX Investigators.

87.     Section III (G) of the NYU Procedures provides the Complainant and the Respondent to review a draft of the Title IX Investigators' report and "identify any additional information or witnesses."  In response to the draft of the First Investigation Summary Report, John Doe identified additional witnesses and asked NYU's Title IX Investigators to speak with them, the Title IX Investigators failed to do so.  He implored the Title IX Investigators to "*[p]lease contact my friend W.M. to testify*" to John Doe's encounter with Jane Roe in the dorm's elevator earlier on the night of the Alleged Incident which would contradict her claim of incapacitation.  John Doe also provided the names of two additional witnesses that he asked the Title IX Investigators to speak with, L.L. and T.V., whom they never bothered to contact.   By failing to interview these additional witnesses, NYU further breached Section III (B) of the NYU Procedures which expressly required the Title IX Investigators were to meet with identified witnesses.

88.     In response to the draft of the First Investigation Summary Report, John Roe also provided the Title IX Investigators with a series of coherent text messages between Jane Roe and John Doe immediately before the Alleged Incident.  In these text messages, Jane Roe confirmed to him that she was only "drunkish" immediately prior to meeting up with John Doe.  Thus, by her own contemporaneous assessment, she was clearly not in "***a state beyond drunkenness or intoxication***" which would constitute "incapacitation" as defined by the NYU Policy when drugs and alcohol are involved.  NYU Policy, § VIII (C) (emphasis supplied).  Due to their bias against John Doe as a male, Defendants Cornell, Hodge and Tomaselli simply disregarded this critical evidence disproving Jane Roe's allegation of a sexual assault.

89.     On June 11, 2018, Defendants Cornell, Hodge and Tomaselli issued their initial Investigation Summary Report to Defendants Jolley and Signor.  This Report confirms that

Defendants Cornell, Hodge and Tomaselli knew the identity of key witnesses from the beginning of the investigation but simply chose not to interview them despite their obligation to do so under NYU Procedures.

90.     The critical witnesses that Defendants Cornell, Hodge and Tomaselli were on notice of but failed to interview during the First NYU Investigation included: (i) R.A., the student who Jane Roe alleged had a party in his dorm room and had to "half walk and half carry" her back to her own dorm room because she was so intoxicated; (ii) E.G., the friend from out-of-town visiting Jane Roe who was with her at the party and in her dorm room immediately before Jane Roe left to meet up with John Doe; (iii) W.M., a friend of John Doe who was visiting and encountered Jane Roe in the dorm's elevator with John Doe earlier in the evening of the Alleged Incident and observed Jane Roe to be coherent and flirtatious with John Doe; (iv) W.C., a male student who Jane Roe said she messaged, went back to his room, and spoke with for at least 40 minutes shortly before the Alleged Incident; and (v) any of the students who were present at R.A.'s party and could have potentially witnessed Jane Roe drinking and/or her condition.

91.     Critically, it would be determined much later in the proceedings that the witnesses the Title IX Investigators failed to interview had information that wholly contradicted Jane Roe's account of the Alleged Incident, which was favorable to Mr. Doe, and which would ultimately absolve him of any wrongdoing.   By failing to interview these identified witnesses in accordance with Section III (B) of the NYU Procedures, NYU violated John Doe's Title IX rights and breached its contractual obligations to John Doe as a student of the University.

92.     Based upon this extremely limited and inherently flawed "investigation" of events, Defendants Cornell, Hodge and Tomaselli, "in consultation with other University administrators," whose identifies are presently unknown to Plaintiff, erroneously determined that

21

there was sufficient evidence to be considered by an adjudicator as to whether John Doe violated NYU Policy pursuant to Section H (1) of the NYU Procedures and hold a "Sexual Misconduct Hearing." This "determination" of "sufficient evidence" was based upon nothing more than Jane Roe's false accusations against John Doe and motivated by the NYU's bias against John Roe as a male. At all relevant times, the NYU Procedures require that an "[i]nvestigation typically will be completed within thirty-five days from the date of the initiation of the Investigation." *Id.*, §3(I). Per NYU Procedures, the 35-day timeframe for investigation could only be extended for "good cause" and with notice to the parties in writing. *Id.*

93.     NYU did not complete its first investigation of the Alleged Incident until June 11, 2018, which was 111 days after the initiation of the investigation, and thus breached Section 3(I) of the NYU Procedures.

**E.      "The Second NYU Investigation"**

94.     The NYU Defendants clearly were aware at the time of the First NYU Investigation that evidence of any misconduct by John Doe was lacking but, based upon their bias against him as a male, they proceeded with disciplinary hearings with the predetermined result of finding him guilty of a sexual assault.

95.     On July 24, 2018, Defendants Hodge and Wade issued an "Investigation Supplemental Report" to Defendants Jolley and Signor (the "NYU Investigation Supplemental Report").

96.     According to the NYU Investigation Supplemental Report, Defendant Jolley instructed the Title IX investigators to go back and interview three additional witnesses: (i) R.A. (the student that had a party on the night of the alleged incident and whom Jane Roe alleges had to help her home because she was so drunk); (ii) W.M. (who was visiting John Doe that night

and present when they saw Jane Roe in the elevator); and (iii) E.G. (Jane Roe's high school friend who was visiting from out of town).  Again, the only witnesses that the Title IX Investigators interviewed prior to issuing the First NYU Investigation Report were John Doe and Jane Roe.

97.    As confirmed by Defendants Hodge and Wade in the NYU Investigation Supplemental Report, the three witnesses that they were instructed to interview provided absolutely no evidence of misconduct.  Indeed, R.A. refused to be interviewed and W.M. said he saw Jane Roe in the elevator and she was not incapacitated. When investigators spoke to Jane Roe's friend, E.G., she ***contradicted*** Jane Roe's claim of an alleged sexual assault.  While Jane Roe claims that R.A. and E.G. had to assist Jane Roe back to her dorm room from R.A.'s party because she was intoxicated, E.G. told NYU's investigators this did not happen.  According to E.G., Jane Roe left her at R.A.'s party and they met up later in Jane Roe's dorm room.  Also, E.G. said that although she took the videos submitted by Jane Roe, she believed Jane Roe was ***exaggerating*** her level of intoxication for the camera to make E.G. laugh.  Furthermore, E.G. said Jane Roe did not make any statements indicating that Jane Roe was in "***a state beyond drunkenness or intoxication.***"  NYU Policy, § VIII (C) (emphasis supplied).  To the contrary, E.G. said Jane Roe told E.G. that "she was leaving to go meet up with 'the boy'" and left the dorm room of her own free will.  The NYU Defendants simply disregarded this exculpatory evidence.

98.    In sum, despite a complete lack of evidence, and new evidence disproving Jane Roe's allegations obtained at Jolley's direction, NYU nonetheless erroneously determined for a second time that there was sufficient evidence to proceed to a Sexual Misconduct Hearing.

99.     Once again, by failing to fully investigate the Alleged Incident and to consider the evidence neutrally to both students, NYU violated John Doe's Title IX rights and breached its own Policies and Procedures by proceeding to a "Sexual Misconduct Hearing" without sufficient, or even credible, evidence that John Doe had violated NYU Policy.

100.    Moreover, based upon Defendants Cornell, Hodge and Tomaselli refusal to interview any witnesses other than Jane Roe and John Doe until they were directed to interview R.A., W.M. and E.G. by Defendant Jolley, the investigation was even further prolonged beyond the 35-day requirement without good cause in violation of Section III(I) of the NYU Procedures. Indeed, the Second NYU Investigation was not completed until more than five months after NYU initiated the First NYU Investigation after Jane Roe's report on or about February 21, 2018.

**F.     The "First Sexual Misconduct Hearing"**

101.    Section IV(B)(1) of the NYU Procedures require that that "[t]ypically a hearing will be held within sixty days of the initiation of the Investigation" unless good cause exists and notice is provided to the parties.  NYU Procedures, § IV(B)(1) (*emphasis supplied*).

102.    Defendant NYU did not commence the "First Sexual Misconduct Hearing" until August 22, 2018, nearly six months after the initiation of the investigation after the Alleged Incident was reported by Jane Roe on or about February 21, 2018, and thus breached Section IV(B)(1) of the NYU Procedures.

103.    Section IV(A)(2) of the NYU Procedures require that NYU select an administrator to adjudicate the hearing and that said adjudicator must have relevant training and experience and "must also be impartial and free from bias or conflict of interest."

104.     For reasons unknown to Plaintiff, Defendant NYU selected Defendant Jolley, the Director of NYU's OSC, to be the Adjudicator for the Sexual Misconduct Hearing despite the fact that he participated in the investigations to date by NYU and demonstrated bias against John Doe as the accused male by limiting the Title IX Investigators to interviews of three witnesses despite the fact that numerous other witnesses had been identified by the Complainant and John Doe.  The appointment of Defendant Jolley as Adjudicator constituted a violation of Section IV(A)(2) of the NYU Procedures.

105.     Additionally, for reasons unknown to Plaintiff, Defendant Metzler, an attorney from the NYU Office of General Counsel, was appointed "Advisor to the Adjudicator."

106.     In addition to Jolley and Metzler, Defendants Hodge, Maeder, Shepard also attended the First Sexual Misconduct Hearing on behalf of NYU.

107.     Shortly before the Hearing, NYU notified John Doe that he would be only permitted one person to attend the hearing on his behalf, which was his attorney.

108.     No witnesses to the Alleged Incident attended the Hearing in person.  However, Jane Roe's out-of-town friend, E.G. (in Australia), and John Doe's friend, W.M. (in China), appeared by Skype.

109.     Although Defendant Jolley, as the Adjudicator, had the power to "identify any witnesses that he/she wishes to hear from at the hearing based on a review of the Investigation report" pursuant to Section IV(B) of the NYU Procedures, upon information and belief, Defendant Jolley did not request that any of the witnesses that were identified in the First and Second NYU Investigation Reports or identified by the parties attend the hearing to provide testimony.  Defendant Jolley's decision not to identify witnesses with relevant information to appear at the Hearing demonstrates his clear bias against John Doe as a male, his unwillingness

to consider information that would be helpful to John Doe, and his goal of finding John Doe guilty of a sexual assault at all costs.

110.   At the Hearing, Defendant Hodge provided a summary of the investigation conducted by his office.   Thereafter, Jane Doe, as the Complainant, provided her account of the Alleged Incident and was questioned by the Adjudicator. John Doe's attorney was not permitted to question Jane Roe.   Instead, he was directed to provide written questions to the Adjudicator for consideration. Despite the many inaccurate statements and blatant inconsistencies in Jane Roe's account of events, the Adjudicator chose to ignore several key questions submitted to him by on John Doe's behalf.   For example, the Adjudicator rejected as "inappropriate" multiple written questions John Doe's counsel submitted to probe Jane Roe's year-long delay in reporting the Alleged Incident to NYU.   In addition, the Adjudicator refused to ask multiple questions designed to confront Jane Roe with the multiple inconsistencies between her retelling of the events from 12 months prior, and the inconsistencies with her version of the events as compared to the recollections of a friend with whom she had recently reconciled after an apparent falling out.   Finally, the Adjudicator refused to explore any questions concerning Jane Doe's potential bias arising out of her recent activity and/or participation with campus movements who support limited due process rights afforded to accused in Title IX cases on college campuses.

111.   Defendant Jolley's failures in this regard, with the assistance of his counsel, Defendant Metlzer, demonstrate their clear bias against John Doe as an Asian American male, their unwillingness to consider information that would be helpful to John Doe, and their goal of finding John Doe guilty of a sexual assault at all costs.

112.   John Doe then gave his account of the Alleged Incident and answered questions from the Adjudicator.   W.M., testifying by Skype in the early morning from China, said that

when he and John Doe encountered Jane Roe in the elevator around 2:00AM, she was exhibiting no signs of overt intoxication.  Jane Roe's friend, E.G., also testifying by Skype, said Jane Roe did not display any level of behavior that would have prompted E.G. to be concerned for her when she left the dorm room.  In addition, although E.G. testified that the videos submitted by Jane Roe were taken on the night of the Alleged Incident, she said that she believed Jane Roe had exaggerated her level of intoxication and E.G. thought it was a joke and that Jane Roe was trying to make her laugh. A plain review of the face of the videos confirms this account.  E.G.'s testimony discrediting Jane Roe's version of events was simply disregarded by Defendant Jolley and his advisor, Metzler.

113.    NYU Policy in effect at the time of the alleged incident required Defendant Jolley as the Adjudicator to determine by a preponderance of the evidence whether a violation of the NYU Policy prohibiting sexual misconduct occurred.  Despite clear, affirmative evidence to the contrary, Defendant Jolley erroneously found that "[c]onsidering the totality of these circumstances, I find that a preponderance of the evidence supports that the Complainant was in ***a condition of incapacitation*** on the night of March 17, 2017, that a reasonable sober person in the position of the Respondent should have recognized this condition, and that the Respondent nonetheless engaged in sexual intercourse with the Complainant."

114.    On the basis of this erroneous outcome, the NYU Defendants imposed the following sanctions on John Doe: (i) a suspension for five semesters; (ii) a declaration that John Doe would be a *persona non grata* at NYU during the term of his suspension; (iii) a notation placed on his academic transcript that he was suspended after a finding of responsibility for a code of conduct violation that would remain on his transcript for no less than one year after the conclusion of John Doe's suspension after which he would have to apply to NYU for removal of

the notation, (iv) submit to a reenrollment process as a condition for returning to NYU; and (v) have no contact with Jane Roe (either directly or by third parties) during the remainder of his enrollment at NYU.

115.    Statements made by Defendant Jolley in his Decision are a clear manifestation of bias against John Doe on the basis of his gender and ethnicity.  Although John Doe was later found to be innocent of the alleged sexual assault of Jane Roe, and her story entirely discredited by witnesses that the Title IX Investigators should have spoken to prior to this hearing, Defendant Jolley wrote that he was imposing particularly harsh sanctions on John Doe because of his "apparent failure to recognize the impact and harm caused by his conduct.  During the hearing, the regrets repeatedly expressed by the Respondent seemed to be only about the location of the sexual activity and not wearing a condom, with no apparent understanding or reflection about how the situation has impacted Complainant."  In short, Defendant Jolley imposed harsh sanctions against Plaintiff because he refused to apologize for a sexual assault that he did not commit.

116.    Defendant Jolley's statement is profound in that he admits that his decision was not the product of an objective view of the evidence, but rather motivated by his own bias that Jane Roe, as the female, was a victim of her encounter with John Doe, the male.  Indeed, in the face of both written evidence (the text messages) and testimony from friends to the contrary, the Adjudicator wholly credits Jane Roe's version of events and admonishes John Doe for not being sorry as the Adjudicator thought he should have been for his encounter with Jane Roe which, by all credible evidence, was completely voluntary.  Plainly, Defendant Jolley was motivated to find John Doe guilty at the hearing and punish him harshly on the basis of his sex as a male whom Jolley perceived not to be remorseful enough at the hearing for a sexual encounter with Jane

Roe, a female.  In fact, John Doe was later found to be innocent of the alleged sexual assault and therefore had nothing to be remorseful for.

117.    Defendant Jolley's overt gender bias against John Doe as a male is further evidenced by his admission in his Summary and Decision that his decision was also motivated by the fact that John Doe's encounters with Jane Doe prior to the Alleged Incident "had consisted only of occasional text messages and a single encounter for about twenty minutes that occurred some five months earlier" and that "[t]hey had never had any discussion or behavior to suggest romantic or sexual interest and had never engaged in any physical intimacy prior to this night."

118.    Moreover, Defendant Jolley's bias against John Doe as an Asian American male was revealed in his decision to wholly discredit the testimony of John Doe and his Asian American friend, W.M., as to Jane Roe's condition and physical appearance while in the elevator at around 2:00 a.m.  Instead, Defendant Jolley adopted inconsistent and ever-shifting statements given by Jane Roe and her friend, E.G., two while females, as to Jane Roe's level of intoxication, while also disregarding exculpatory text message evidence containing Jane Roe's own written statement of her level of intoxication immediately prior to encountering John Doe in the study room:  "I'm drunk*ish*."  (Emphasis supplied).

119.    The plain import of Jolley's statements is that he found John Doe to be guilty of sexual assault not on the basis of fact but rather based upon gender bias against John Doe as a male because his encounter with Jane Roe was not "romantic." Defendant Jolley's erroneous decision motivated by bias against John Doe as a male was further discredited by the fact that Jane Roe's own friends testified that, in fact, she had expressed a romantic interest in John Doe and even referred to him as the "cute Asian boy."

**G.**     **Appeal of the Adjudicator's Decision and Remand by the Appeal Panel**

*1.*     John Doe timely appealed Defendant Jolley's Decision to NYU's Appeal Panel, citing NYU's failure to "investigate equitably material facts probative of the Complainant's alleged intoxication, which are material procedural matters in fairly determining this matter and, worse, breaches of NYU's responsibilities under Title IX."  Following discussions between John Doe's counsel and NYU's Office of the General Counsel after John Doe's appeal was filed, NYU agreed to stay its immediate suspension of John Doe pending outcome of the appeal.

2.     On October 1, 2018, the Sexual Misconduct Appeal Panel, comprised of NYU faculty unaffiliated with the Title IX investigation, Kate Baier, Christopher Bledsoe, and Daniel Holub, issued a Sexual Misconduct Appeal Panel Decision (the "Appeal Decision") holding that the Adjudicator's finding of "sufficient evidence" of sexual assault due to Jane Roe's alleged incapacitation as defined by NYU Policy was in error.

3.     In the Appeal Decision, the Appeal Panel cited specific evidence inconsistent with Defendant Jolley's finding of incapacitation, including the text messages Jane Roe herself submitted to the investigators, and the statements provided by Jane Roe's friend, E.G., that "she did not remember helping Complainant back to her room and told Investigators that she believed Complainant was exaggerating her level of intoxication when the videos were taken."  This same evidence was available to and simply disregarded by the Adjudicator due to bias.

4.     The Appeal Panel also found that NYU's Title IX Investigators did not interview witnesses "who may have evidence that is highly probative of Complainant's level of intoxication prior to her sexual encounter with Respondent – prior to the hearing."

5.     Based upon its determinations, the Appeal Panel sent the matter back "for further investigation" and "further proceedings."

6.     In its Decision, the Appeal Board identifies specific witnesses with relevant information that should have been interviewed by the NYU Title IX Investigators.  The Appeal Board states that the "NYU's Investigators should make all reasonable efforts to identify and interview the Complainant's suitemate, [K.S.], as well as other students who were present at [R.A.'s] room on March 17, 2017, and can testify to [Jane Roe's] level of intoxication at the time she left [R.A's] room at the end of the night.  Investigators should also attempt to interview W.C., who the Complainant requested be interviewed.  W.C. may well have evidence that would be helpful in determining [Jane Roe's] level of intoxication and in establishing a timeline for the evening."   All of these witnesses were undergraduate students at NYU at the time and "available" to NYU had it chosen, or otherwise was competent, to conduct a reasonable "investigation."

7.     The only explanation for NYU's failure to conduct a proper investigation and hearing and multiple breaches of its own Procedures, as determined by the Appeal Panel, is gender bias against John Doe and a predetermination by Defendants to find John Doe guilty of a sexual assault of Jane Roe at all costs and despite ample evidence to the contrary.

**H.     "The Third NYU Investigation"**

126.     Once again, Section III(I) of the NYU Procedures requires that NYU complete an investigation within 35 days unless good cause is shown and there is notice to the parties.  NYU again breached Section III(I) of the NYU Procedures by failing to complete the Third NYU Investigation until a full fifty-eight days after the Appeal Decision, on November 27, 2018.

127.     Specifically, on November 27, 2018, Title IX Investigators, Defendants Cornell, Hodge, Tomaselli, and Wade issued a new "Investigation Summary Report" to Defendant Jolley. The Post-Appeal Report now included interviews of no less than seven additional witnesses not

previously interviewed by Defendants Cornell, Hodge, Tomaselli, and Wade prior to the Sexual Assault Hearing.

128.    Statements from these additional witnesses, as set forth in the new Investigation Summary Report, completely and unequivocally precluded any possible finding that Jane Roe was in a state of "incapacitation" at the time of the Alleged Incident and further discredited her version of events, thus further establishing that there was no basis to find that there was sufficient evidence that John Doe violated NYU Policy and proceed to a ***second*** Sexual Misconduct Hearing.

129.    For example, contrary to Jane Roe's claim that she was so drunk when she left R.A.'s party that she had to be "'half walked, half carried'" back to her dorm by E.G. and R.A., R.A. (like E.G.) had no recollection of this.  In fact, R.A. could not recall whether Jane Roe was even at the party.

130.    In another example, Jane Roe's suitemate, K.S. said she ***never*** saw Jane Roe drunk to the point of being "'sloppy' or 'obnoxious'" and had a specific recollection of Jane Roe being "'proud'" of the encounter with John Doe in the days after it happened and being "'surprised'" when she later learned that Jane Roe was characterizing the encounter as "'rape.'"[2]

131.    In sum, of the seven witness statements, three specifically supported John Doe's position (K.S., C.G., S.S.) and three claimed to have no knowledge of the issues involved (N.W., R.A., A.M.).  The remaining witness, W.C., admitted that Jane Doe contacted him in March

---

[2] Through learning of this "evidence," John Doe reserves his right to pursue this, and related types of, statement(s) by Jane Roe as defamation of John Doe's character.  Notably, Jane Roe met with at least two witnesses in advance of the disciplinary hearings to persuade them to give statements supporting her allegation that John Doe sexually assaulted her.  Jane Roe also continued to falsely accuse John Doe of "rape" during the second Sexual Misconduct Hearing.  Thus, it is likely that discovery may reveal that Jane Roe is liable for defamation of John Doe's character based upon statements she may have made to fellow students, among others, and that her conduct in this regard was, in part, due to Defendants' discriminatory conduct against John Doe.  John Doe reserves his rights to pursue all claims against Jane Roe as well as the NYU Defendants upon receiving discovery confirming defamatory statements were made.

2018 to recruit his recollection that he "saw [Jane Roe] that night and how intoxicated [she] was" and that she would like him to be a witness to show "'she was intoxicated.'"

132.    Despite substantial new and exculpatory evidence, Defendants Cornell, Hodge, Tomaselli, and Wade, in consultation with other, unknown University administrators, erroneously determined that there was "sufficient evidence" to be considered by an adjudicator as to whether John Doe violated NYU Policy.   The only possible explanation for NYU's repeated erroneous determinations can be gender and/or ethnicity bias against John Doe and a predetermination by Defendants to find John Doe guilty of a sexual assault of Jane Roe at all costs and despite ample evidence to the contrary.

**I.    Criticisms of NYU's Previous Lenient Handling of Sexual Assault Complaints By Female Students and Public Pressure on NYU to Hold Males Accountable**

133.    The First Investigation, the Sexual Misconduct Hearing, the Adjudicator's Decision, and the Third Investigation Report against John Doe were motivated by gender bias with the intended result of finding John Doe in violation of NYU Policy against sexual misconduct whether or not this outcome was supported by an objective view of the totality of evidence.   Thus, NYU repeatedly violated John Doe's Title IX rights.

134.    The gender bias against John Doe is abundantly clear from enormous pressure on the University from its students and financial supporters to punish sexual misconduct by males on campus aggressively.

135.    Among other things, on August 15 – 16, 2018, approximately two weeks before NYU held the Sexual Assault Hearing of Jane Roe's allegation against John Doe, a female NYU student and alleged rape victim issued a series of social media posts alleging NYU had failed her as a victim of sexual misconduct by declining to sanction two male students for alleged nonconsensual sex.   The post was distributed to at least 1000 people with other women

commenting, *inter alia*, that "I hope these protests and riots make NYU see that what they're pulling is detrimental to the entire female student body."  Other comments to the NYU student's post included: (i)"Absolutely horrifying.  NYU is likely in for a year of protests, it's been brewing for ages.  Women at our school are fed up"; and (ii) "NYU does not protect its female students . . . NYU has failed me and countless other girls, teaching us that standing up for ourselves is a complete waste of our time."

136.    Also, immediately prior to NYU's further investigation of the Alleged Incident after an appeal, on October 20, 2018, *The New York Post* published an article with the headline "Hundreds of sex misconduct incidents reported at Cornell, NYU" and reporting that 100 sexual misconduct complaints were made in the first five months of 2018 and quoted an NYU spokeswoman as stating that "our students feel more comfortable coming forward to file these kind of reports."[3]

137.    Also, in or about October 2017, the #MeToo Movement occurred and NYU, like many other colleges and other institutions throughout the country, came under public scrutiny and were criticized for not taking the complaints of female students of sexual misconduct by male students seriously.

138.    Additionally, at the time of the First Sexual Misconduct Hearing, NYU continued to follow then-withdrawn guidance issued by the United States Education Department's Office of Civil Rights ("OCR").  Specifically, on April 11, 2011, OCR issued a "Dear Colleague" letter to colleges and universities, which required schools to adopt a relatively low burden of proof – "more likely than not" – in cases involving sexual misconduct, including assault.  The Dear Colleague Letter further stated that schools should "minimize the burden on the complainant,"

---

[3]    https://nypost.com/2018/10/20/hundreds-of-sex-misconduct-incidents-reported-at-cornell-nyu/.

transferring alleged perpetrators, if necessary, away from shared courses or housing.  The Dear Colleague Letter, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy.  As described by NPR, that Dear Colleague Letter was a "first warning shot" at colleges and universities to step up increased enforcement of Title IX. This Dear Colleague Letter was withdrawn in September 2017, yet NYU prosecuted John Doe in 2018 in accordance with its glaring bias against male students accused of sexual misconduct.

139.    On September 22, 2017, U.S. Secretary of Education announced the release of new interim Q&As for schools on how to investigate and adjudicate allegations of campus sexual misconduct under federal law.  *See* U.S. Department of Education Press Release dated September 22, 2017.  The Q&A's explain the Department's current expectations of schools, and the Department stated that it would continue to rely on its Revised Sexual Harassment Guidance, which was informed by a public comment process and issued in 2001, as well as the Dear Colleague Letter on Sexual Harassment issued on January 25, 2006.

140.    On September 22, 2017, the Department also withdrew its Dear Colleague Letter on Sexual Violence dated April 4, 2011 ("Withdrawn Colleague Letter"), and the Questions and Answers on Title IX Sexual Violence dated April 29, 2014 (the "Withdrawn Q&A," and collectively with the Withdrawn Colleague Letter, the "Withdrawn Policies").  Importantly, the Department stated, "The withdrawn documents ignored notice and comment requirements, created a system that lacked basic elements of due process and failed to ensure fundamental fairness."

141.    It has been reported in the press that:

"This [Withdrawn Colleague" letter], issued by the Office for Civil Rights (OCR), told all of the more than 7,000 colleges that receive federal money to use the lowest possible standard of proof, a preponderance of evidence, in sexual assault cases (though not in less serious matters such as cheating and noise

35

violations). The letter required universities to allow accusers to appeal not-guilty findings, a form of double jeopardy.  It further told schools to accelerate their adjudications, with a recommended 60-day limit.  And, perhaps most important, OCR strongly discouraged cross-examination of accusers, given the procedures that most universities employed.

142.   The Obama administration never explained the timing of this document's release. Nor did it explain how a plainly worded, 40-year-old anti-discrimination law had become a fount of such highly controversial mandates." *The Washington Post* January 31, 2017.

143.   Under Q&A 6, NYU should have provided prompt written notice of the allegations, including sufficient details and with sufficient time to prepare a proper response *before* any initial interview.  See Q&A at Q6. (emphasis added).  Sufficient details include, beyond simply the date of the incident and identity of the parties, "the specific section of the code of conduct allegedly violated, the precise conduct alleged constituting the potential violation and the … location of the alleged incident.  Such notice was required so that John Doe would be afforded sufficient time to prepare a response before any initial interview.  None of these details were provided in the initial notice provided by NYU's Title IX coordinator with the NYU Office of Equal Opportunity.

144.   Q&A 6 also places the burden of proof on NYU and not on John Doe or Jane Roe. NYU was required to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct had occurred, and it failed to do so.  Moreover, NYU should have made every effort to avoid depriving John Doe of his education.  Q&A 3.

145.   The procedures put in place by NYU under Title IX ("Procedures") deprived Plaintiff of his rights to an adequate, reliable and impartial investigation and, hence, prompt and equitable resolution.  Specifically: (i) the Procedures permit NYU to investigate complaints against respondents before providing them with proper notice of the charges against them; (ii) a

review panel rubber stamps the Investigator's findings and is prohibited from conducting its own investigation; (iii) Respondents are denied the right to confront their accusers, cross-examine witnesses and put on their own evidence and testimony; and (iv) the Director NYU Office of Student Conduct singlehandedly decides the sanction to be imposed against the respondent.

146.    Upon information and belief, NYU's Title IX Investigators lacked the experience and training necessary to conduct a proper investigation against Plaintiff.

147.    NYU imposed sanctions on Plaintiff without conducting a fair, impartial investigation and without credible evidence (or establishing by a preponderance of the evidence) that he engaged in non-consensual sex with Jane Roe.

148.    Furthermore, no cross-examination was available and no sworn testimony was taken in violation of basic fairness in a case where Defendant NYU relied upon a credibility assessment.  The prohibition against cross-examination of witnesses was contained in the 2011 Dear Colleague Letter which was withdrawn by the Secretary of Education effective September 22, 2017.

## J.    The Second *De Novo* Sexual Misconduct Hearing

149.    On January 2, 2019, the OSC notified John Doe that it conducted "further investigation" and that a second "Sexual Misconduct Hearing" will be held on January 28, 2019. In violation of its own Procedure, requiring "pre-hearing" appointment of an "external adjudicator" for designated reasons, NYU advised John Doe that a second, *de novo* Sexual Misconduct Hearing would take place before an external arbitrator, Hon. Jane Cutler Greenspan.

150.    Judge Greenspan was a "College and University Title IX" adjudicator and former sex crimes prosecutor selected *sua sponte* by NYU for this process by NYU with no notice to

John Doe.  NYU refused to disclose any information to John Doe regarding its appointment of Jane Greenspan.

151.    The Second Sexual Misconduct Hearing was held on January 28, 2019 and was attended by: (i) Jane Roe; (ii) a support person to Jane Roe; (iii) an attorney representing Jane Roe; (iv) John Doe and his attorneys; (v) Defendant Hodge; (vi) Defendant Maeder; and (v) Defendant Metzler.  Additionally, two witnesses, E.G. and W.M., provided statements during the hearing by Skype.

152.    Following the Second Sexual Misconduct Hearing, Judge Greenspan issued a Summary and Decision in which she found by a preponderance of the evidence that John Doe was not responsible for a sexual assault of Jane Roe under NYU Policy and thus affirmed that each and every prior determination by the NYU Defendants finding there to be sufficient evidence of a sexual assault by John Doe was erroneous and the product of gender bias and the NYU Defendants' predetermination that John Doe would be found guilty of a sexual assault.

153.    Jane Roe appealed Judge Greenspan's Decision.  John Doe opposed the appeal.

154.    On March 6, 2019, the Appeal Panel issued a Sexual Misconduct Appeal Panel Decision affirming Judge Greenspan's Decision that John Doe was not responsible for a sexual assault of Jane Roe.

**K.    John Doe Has Suffered Substantial Damages as a Result of the NYU Defendant's Biased and Flawed Proceedings**

155.    In total, after an investigation that lasted more than eleven months, two full disciplinary hearings, and two formal appeals, Mr. Doe was found to be innocent of any sexual misconduct, or any violation of NYU policy whatsoever, and no sanctions were ultimately imposed against him.  However, Mr. Doe and his family have suffered tremendous damage as a result of this outrageous process.  In total, John Doe was under investigation and subject to

disciplinary proceedings for a sexual assault that he did not commit for over a year from February 18, 2018 through March 6, 2019.

156.     As a result, John Doe has suffered enormous damages arising from the substantial emotional trauma inflicted upon him as a result of Defendants' biased and unconstitutional actions including, but not limited to, acute anxiety, feelings of self-doubt and extremely negative thoughts which have and will require costly and extensive ongoing medical and psychological treatment.

157.     John Doe has also suffered damages due to continuous interruptions in his academic and social well-being at college during this time due to the NYU Defendants' actions, as well as damages arising from the substantial and unnecessary reputational damage and other injuries that John Doe has suffered.

158.     John Doe and his family have also incurred substantial monetary damages in having to retain counsel to unnecessarily defend John Doe against false accusations of a sexual assault in proceedings that were unnecessarily prolonged due to NYU and its Title IX Investigators' bias and unrelenting desire to find John Doe guilty of a sexual assault of a female at all costs.  Indeed, John Doe has incurred several hundreds of thousands of dollars in legal fees in defending himself against baseless claims of a sexual assault.

## COUNT I
### (VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972)
### (Against Defendant NYU)

159.     Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1 through 158 as if fully set forth herein.

160.     Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 *et. seq.*) ("Title IX"), provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex,

be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . ." 20 U.S.C. § 1681(a).

161.    Title IX applies to an entire school or institution if any part of that school receives federal funds.

162.    Upon information and belief, in 2015, NYU received approximately $344 million in federal research funding, and continued to receive millions of dollars in federal funds in 2016, 2017, 2018 and 2019.   Any such funding, as well as other federal funding, is at risk if NYU fails to comply with Title IX.

163.    During the years 2017, 2018 and through to the present, Defendant NYU has been the subject of criticism from student body for not taking complaints of female students of sexual assaults by males seriously.

164.    During the years 2017, 2018 and through to the present, Defendant NYU has been the subject of criticism from the public generally for not taking complaints of female students of sexual assaults by males seriously.

165.    As a result of the aforementioned criticism from both its student body and the public generally, Defendant NYU was motivated to favor female accusers such as Jane Roe over accused males such as John Doe upon receiving, investigating and deciding complaints of sexual misconduct by female students.

166.    As a result of the aforementioned criticism from both its student body and the public generally, Defendant NYU was under pressure to aggressively prosecute male students for claims of sexual misconduct by female students.

167.    As described in detail above, Defendant NYU violated John Doe's civil rights under Title IX by intentionally acting with sex bias in investigating, repeatedly making erroneous decisions finding John Doe guilty of a sexual assault, and by imposing unwarranted disciplinary action upon John Doe based upon the NYU Officials' and the NYU Title IX Investigators', among others, biased and erroneous decisions.

168.    Defendant NYU's acts that are alleged herein to be violations of Plaintiff's Title IX rights occurred with the past three years and thus are within the three year statute of limitations for Title IX claims.

169.    Defendant NYU violated John Doe's civil rights under Title IX by selectively enforcing NYU Policy against John Doe on the basis of his sex and thus violated his constitutional right to be free from discrimination on the basis of sex in violation of Title IX.

170.    To John Doe's severe detriment, upon Jane Roe's complaint made February 18, 2018, Defendant NYU and the NYU Officials and NYU's Title IX Investigators, among others, immediately presumed that, as the male, John Doe was guilty of an alleged sexual assault on Jane Roe and proceeded with all due haste to selectively enforce NYU's Policy against him and find him guilty of having "Non-Consensual Intercourse" with Jane Roe while she was allegedly "incapacitated."

171.     Defendant NYU's gender bias in violation of Title IX is evidenced by, among other things, the fact that the NYU Officials and the NYU Title IX Investigators, among others, simply ignored irrefutable evidence of Jane Roe's lack of incapacitation in the form of completely coherent text messages that she exchanged with John Doe immediately before the Alleged Incident, Jane Roe's own statements to the Title IX Investigators evidencing clear recollections of her consent to the sexual encounter and which contradicted her claim of an

unwanted sexual assault by John Doe, and statements of third party witnesses that contradicted Jane Roe's claim against John Doe and which evidenced that John Doe did not sexually assault Jane Roe.

172.    Defendant NYU's gender bias in violation of Title IX is also evidenced by the NYU Officials' and the NYU Title IX Investigators' repeated decisions not to conduct a proper investigation of Jane Roe's allegation against John Doe and failure to collect and/or simply ignoring, highly relevant evidence and decisions not to interview witnesses that had been identified to them at the outset of their investigation and whom ultimately had information that would wholly contradict Jane Roe's accusations against John Doe and her account of the Alleged Incident. Rather, based upon a perfunctory, flawed, and wholly biased investigation, Defendants proceeded to hold a disciplinary hearing with the predetermined outcome that John Doe would be found guilty of a sexual assault, which he was.

173.    Defendant NYU's gender bias in violation of Title IX is also evidenced by the fact that the NYU Officials and the NYU Title IX Investigators, among others, repeatedly formed conclusions in favor of Jane Roe even though the evidence substantially favored John Doe's innocence of any sexual assault on her.

174.    Defendant NYU's actions were intentional and motivated by gender bias and by its desire to find Plaintiff guilty of sexual assault at all costs solely on the basis of his gender as an alleged male aggressor in violation of his Title IX rights.

175.    Defendant NYU's gender bias in violation of Title IX is also is evident from the NYU Officials and the NYU Title IX Investigators, among others, repeated breaches of specific NYU policies and procedures that they were required to, but failed, to follow in conducting the

purported "investigation" and in the process of conducting disciplinary proceedings at which John Doe was erroneously found guilty of a sexual assault.

176.    Defendant NYU's gender bias in violation of Title IX is further demonstrated by flaws in the NYU Title IX Investigators' investigations; the fact that there were no less than three separate investigations and two separate disciplinary proceedings; the unnecessarily prolonged disciplinary process; the Title IX Investigators and Adjudicator's unwillingness to consider substantial evidence of John Doe's innocence; overt statements made by Defendant Jolley as Adjudicator in his written decision demonstrating clear gender bias; and an investigation that was conducted in a completely one-sided and determinative style with the intended result of finding John Doe guilty of a sexual assault at all costs.

177.    Gender discrimination was a substantial and motivating factor for the aforementioned actions by Defendant NYU.

178.    Additionally, upon information and belief, the fact that gender discrimination was a substantial and motivating factor for the NYU Defendants' actions as detailed herein will be further demonstrated by a pattern of bias against males by the NYU Defendants; statistical evidence indicating that males are invariably found guilty of sexual misconduct at NYU; and a presumption of male guilt demonstrated by the NYU Defendants in sexual misconduct investigations and hearings.

179.    As a direct and proximate result of the above conduct, Plaintiff has sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, damage to his academic performance, interruptions in his academic and social well-being at college economic injuries, reputational injuries and other direct and consequential damages.  Plaintiff also has incurred, and will continue to incur, costs for ongoing

medical and psychological treatment.  Additionally, Plaintiff has incurred substantial legal fees and other costs in connection with the NYU investigations and disciplinary proceedings.  As the prevailing party of the disciplinary proceedings against him, Plaintiff is entitled to recover reasonable attorneys' fees and costs on his Title IX claim against Defendant NYU.

180.    Accordingly, Plaintiff John Doe is entitled to damages in an amount in excess of the jurisdictional requirements of this Court and in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, costs and expenses.

## COUNT II
## (VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW, N.Y. EXECUTIVE LAW § 290, *ET. SEQ.*)
### (Against All Defendants)

181.    Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1 through 180 as if fully set forth herein.

182.    Section 296(4) of the NYSHRL states "[i]t shall be an unlawful discriminatory practice for an education corporation or association which holds itself out to be public to be non-sectarian and exempt from taxation pursuant to the provisions of article four of the real property tax law to deny the use of its facilities to any person otherwise qualified, or to permit the harassment of any student or applicant, by reason of his race, color, religion, disability, national origin, sexual orientation, gender identity or expression, military status, sex, age or marital status . . ."

183.    Defendant NYU is an education or association which holds itself out to the public to be a non-sectarian school and exempt from taxation pursuant to the provisions or article four of the real properly tax law.

184.    As detailed above, Defendant NYU discriminated against Plaintiff John Doe on the basis of his sex and thus violated Section 296(4) of the NYSHRL.

185.    Section 296(6) of the NYSHRL states that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any acts forbidden under this article, or to attempt to do so."

186.    As detailed above, each of the individual Defendants Jolley, Maeder, Signor, Metzler, Hodge, Shepard, Cornell, Wade, Tomaselli, and John Does 1 to 10 participated in the discriminatory conduct at issue and/or supervised other employees at NYU who engaged in discriminatory conduct against John Doe and did nothing to stop it and/or aided, abetted, incited, compelled and/or coerced others to discriminatory against John Doe on the basis of his sex and thus violated Section 296(6) of the NYSHRL.

187.    During the years 2017, 2018 and through to the present, Defendant NYU has been the subject of criticism from student body for not taking complaints of female students of sexual assaults by males seriously.

188.    As a result of the aforementioned criticism from both its student body and the public generally, the individual Defendants were motivated to favor female accusers such as Jane Roe over accused males such as John Doe upon receiving, investigating and deciding complaints of sexual misconduct by female students.

189.    As a result of the aforementioned criticism from both its student body and the public generally, the individual Defendants were under pressure to aggressively prosecute male students for claims of sexual misconduct by female students.

190.    Defendant NYU and/or the individual Defendants Jolley, Maeder, Signor, Metzler, Hodge, Shepard, Cornell, Wade, Tomaselli, and/or John Does 1 to 10 committed acts that are alleged herein to be violations of Plaintiff's rights under the NYSHRL occurred with the past three years and thus are within the three year statute of limitations for NYSHRL claims.

191.    Defendant NYU and/or the individual Defendants Jolley, Maeder, Signor, Metzler, Hodge, Shepard, Cornell, Wade, Tomaselli, and/or John Does 1 to 10 violated John Doe's rights under NYSHRL by selectively enforcing NYU Policy against John Doe on the basis of his sex and thus violated his right under New York State law to be free from discrimination on the basis of sex.

192.    To John Doe's severe detriment, upon Jane Roe's complaint made February 18, 2018, Defendant NYU and the NYU Officials and NYU's Title IX Investigators, among others, immediately presumed that, as the male, John Doe was guilty of an alleged sexual assault on Jane Roe and proceeded with all due haste to selectively enforce NYU's Policy against him and find him guilty of having "Non-Consensual Intercourse" with Jane Roe while she was allegedly "incapacitated."

193.    Defendant NYU and/or the individual Defendants' bias is evidenced by, among other things, the facts that they simply ignored irrefutable evidence of Jane Roe's lack of incapacitation in the form of completely coherent text messages that she exchanged with John Doe immediately before the Alleged Incident, Jane Roe's own statements to the Title IX Investigators evidencing clear recollections of her consent to the sexual encounter and which contradicted her claim of an unwanted sexual assault by John Doe, and statements of third party witnesses that contradicted Jane Roe's claim against John Doe and which evidenced that John Doe did not sexually assault Jane Roe.

194.    Defendant NYU and/or the individual Defendants' bias is also evidenced by their repeated decisions not to conduct a proper investigation of Jane Roe's allegation against John Doe and failure to collect and/or simply ignoring, highly relevant evidence and decisions not to interview witnesses that had been identified to them at the outset of their investigation and whom

46

ultimately had information that would wholly contradict Jane Roe's accusations against John Doe and her account of the Alleged Incident. Rather, based upon a perfunctory, flawed, and wholly biased investigation, Defendants proceeded to hold a disciplinary hearing with the predetermined outcome that John Doe would be found guilty of a sexual assault, which he was.

195.    Defendant NYU and/or the individual Defendants' bias is also evidenced by the fact that the NYU Officials and the NYU Title IX Investigators, among others, repeatedly formed conclusions in favor of Jane Roe even though the evidence substantially favored John Doe's innocence of any sexual assault on her.

196.    Defendant NYU and/or the individual Defendants' bias also is evident from their repeated breaches of specific NYU policies and procedures that they were required to, but failed, to follow in conducting the purported "investigation" and in the process of conducting disciplinary proceedings at which John Doe was erroneously found guilty of a sexual assault.

197.    Defendant NYU and/or the individual Defendants' actions were at all times intentional and motivated by gender bias and by their desire to find Mr. Doe guilty of sexual assault at all costs solely because of Mr. Doe's gender as an alleged male aggressor in violation of his rights under the NYSHRL.

198.    Defendants' gender bias in violation of NYSHRL is further demonstrated by flaws in the NYU Title IX Investigators' investigations; the fact that there were no less than three separate investigations and two separate disciplinary proceedings; the unnecessarily prolonged disciplinary process; the Title IX Investigators and Adjudicator's unwillingness to consider substantial evidence of John Doe's innocence; overt statements made by Defendant Jolley as Adjudicator in his written decision demonstrating clear gender bias; and an investigation that

was conducted in a completely one-sided and determinative style with the intended result of finding John Doe guilty of a sexual assault at all costs.

199.    Gender discrimination was a substantial and motivating factor for the aforementioned actions by the Defendants.

200.    Additionally, upon information and belief, the fact that gender discrimination was a substantial and motivating factor for the NYU Defendants' actions as detailed herein will be further demonstrated by a pattern of bias against males by the NYU Defendants; statistical evidence indicating that males are invariably found guilty of sexual misconduct at NYU; and a presumption of male guilt demonstrated by the NYU Defendants in sexual misconduct investigations and hearings.

201.    As a direct and proximate result of the NYU Defendant's violations of Plaintiff's rights under NYSHRL, Plaintiff has sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, damage to his academic performance, interruptions in his academic and social well-being at college economic injuries, reputational injuries and other direct and consequential damages.  Plaintiff also has incurred, and will continue to incur, costs for ongoing medical and psychological treatment. Additionally, Plaintiff has incurred substantial legal fees and other costs in connection with the NYU investigations and disciplinary proceedings.

202.    Accordingly, Plaintiff John Doe is entitled to damages in an amount in excess of the jurisdictional requirements of this Court and in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, costs and expenses.

## COUNT III
## BREACH OF CONTRACT
### (Against Defendant NYU)

203.    Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1 through 202 as if fully set forth herein.

204.    In New York, the relationship between a university and its students is contractual.

205.    Plaintiff Doe applied to NYU to obtain his undergraduate degree.  NYU extended an offer of admission to Mr. Doe, which he accepted.    In 2016, Mr. Doe was admitted as a freshman in NYU's Tisch School of the Arts and he is currently in his junior year of college.  For every semester beginning in Fall 2016 through to the present, Mr. Doe and his family have been billed by NYU for tuition and fees and have paid these bills in the amount of several hundreds of thousands of dollars.  Based upon the aforementioned facts and circumstances, NYU entered into express and implied contracts with John Doe.

206.    The terms of the contract between John Doe and NYU are set forth in, *inter alia*, NYU's Policy and NYU's Procedures referenced above.

207.    As detailed above, Defendant NYU breached numerous NYU Policies and Guidelines in connection with the investigation and disciplinary process proceedings.  A non-exhaustive list of NYU's breaches include the following:

(i)     Sec. III (B) of NYU Procedures which requires Title IX Investigators to meet with "identified witnesses" "who may have relevant information." Rather, NYU initially proceeded to a disciplinary proceeding without speaking to a *__single witness__* other than Mr. Doe and Ms. Roe including witnesses that they both identified to the investigators.

(ii)    Sec. III(I) of NYU Procedures which states that an investigation "typically will be completed within thirty-five days from the date of the initiation of the Investigation" unless good cause exists and the reason for the extensions must be "shared with the parties in writing."

(iii)  Sec. IV(B)(1) of NYU Procedures which states that a hearing will be held within sixty days from the date of the initiation of the Investigation unless good cause exists and the reason for the extensions must be "shared with the parties in writing."

209.   Defendant NYU also breached the "Students' Bill of Rights" at Section X of the NYU Procedures.  As set forth therein, "all students have the right to . . . participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard. *Id.*, § X (4).   By conducting biased and unfair investigations and disciplinary proceedings, as described herein, Defendant NYU repeatedly breached its obligations to John Doe under Section X of the NYU Policy.

210.   As a direct and proximate result of Defendant NYU's breaches of its implied contract with Plaintiff, Plaintiff has sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, damage to his academic performance, interruptions in his academic and social well-being at college economic injuries, reputational injuries and other direct and consequential damages.  Plaintiff also has incurred, and will continue to incur, costs for ongoing medical and psychological treatment.  Additionally, Plaintiff has incurred substantial legal fees and other costs in connection with the NYU investigations and disciplinary proceedings.

211.   Accordingly, Plaintiff John Doe is entitled to damages in an amount in excess of the jurisdictional requirements of this Court and in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, costs and expenses.

**COUNT IV**
**<u>NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>**
**(Against All Defendants)**

212.   Plaintiff John Doe repeats and reasserts the allegations set forth in paragraphs 1 through 211 as though fully set forth herein.

213.    The NYU Defendants owed, and continue to owe, Plaintiff Doe a duty of care as a student of NYU.

214.    Based on the aforementioned facts and circumstances, the NYU Defendants negligently inflicted emotional distress upon Plaintiff John Doe.

215.    The NYU Defendants' extreme and outrageous conduct includes, but is not limited to: (i) the fact that the NYU Defendants conducted no less than three separate investigations and two separate disciplinary proceedings in an effort to hold John Doe liable for a sexual assault that he did not commit solely on the basis of his gender; (ii) the unnecessarily prolonged disciplinary process which caused ongoing anguish to Plaintiff; (iii)  the Title IX Investigators and Adjudicator's unwillingness to consider substantial evidence of John Doe's innocence; (iv) overt statements made by Defendant Jolley as Adjudicator in his written decision demonstrating clear gender bias; (v) an investigation that was conducted in a completely one-sided and determinative style with the intended result of finding John Doe guilty of a sexual assault at all costs; and (vi) subjecting Plaintiff *repeatedly* to a process in which he was falsely accused of being a "rapist."

216.    The NYU Defendants' conduct was so outrageous in character, and so extreme on degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

217.    As a direct result of Defendants' extreme and outrageous conduct, Plaintiff John Doe has suffered tremendous damages including, without limitation, severe emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

218.     Accordingly, Plaintiff John Doe is entitled to damages in an amount in excess of the jurisdictional requirements of this Court and in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, costs and expenses.

## COUNT V
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

219.     Plaintiff John Doe repeats and reasserts the allegations set forth in paragraphs 1 through 218 as though fully set forth herein.

220.     The NYU Defendants owed, and continue to owe, Plaintiff Doe a duty of care as a student of NYU.

221.     Based on the aforementioned facts and circumstances, the NYU Defendants intentionally inflicted emotional distress upon Plaintiff John Doe.

222.     The NYU Defendants' extreme and outrageous conduct includes, but is not limited to: (i) the fact that the NYU Defendants conducted no less than three separate investigations and two separate disciplinary proceedings in an effort to hold John Doe liable for a sexual assault that he did not commit solely on the basis of his gender and ethnicity; (ii) the unnecessarily prolonged disciplinary process which caused ongoing anguish to Plaintiff; (iii) the Title IX Investigators and Adjudicator's unwillingness to consider substantial evidence of John Doe's innocence; (iv) overt statements made by Defendant Jolley as Adjudicator in his written decision demonstrating clear gender bias; (v) an investigation that was conducted in a completely one-sided and determinative style with the intended result of finding John Doe guilty of a sexual assault at all costs; and (vi) subjecting Plaintiff *repeatedly* to a process in which he was falsely accused of being a "rapist."

223.    The NYU Defendants' conduct was so outrageous in character, and so extreme on degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

224.    By engaging in the aforementioned extreme and outrageous conduct, the NYU Defendants breached a duty that they owed directly to Plaintiff John Doe which endangered John Doe's physical safety and/or caused John Doe to fear for his own physical safety.

225.    As a direct result of Defendants' extreme and outrageous conduct, Plaintiff John Doe has suffered tremendous damages including, without limitation, severe emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

226.    Accordingly, Plaintiff John Doe is entitled to damages in an amount in excess of the jurisdictional requirements of this Court and in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, costs and expenses.

## COUNT VI
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against Defendant NYU)

227.    Plaintiff John Doe repeats and reasserts the allegations set forth in paragraphs 1 through 226 as though fully set forth herein.

228.    Based on the aforementioned facts and circumstances, NYU breached and violated the covenant of good faith and fair dealing implied in the agreement(s) with John Doe by meting out the disproportionately severe sanction of suspension where there was a lack of credible evidence concerning the claims against him.

229.    As a direct, reasonable and foreseeable consequence of this breach, John Doe sustained damages, including without limitation, emotional distress, economic injuries, the

inability to complete his studies at NYU in a reasonable timeframe, injurious impact on his future career and higher education prospects, and other direct and consequential damages.

230.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, an injunction enjoining enforcements of the sanctions as a result of the breach of the covenant of good faith and fair dealings in adjudicating allegations of alleged sexual misconduct complaints and costs and disbursements.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants as follows:

A.     On the First Cause of Action for Defendant NYU's Title IX violations, damages in an amount in excess of the jurisdictional requirement of this Court and to be determined at trial, plus interest and costs;

B.     On the Second Cause of Action against all Defendants for NYSHRL violations, damages in an amount in excess of the jurisdictional requirement of this Court and to be determined at trial, plus interest and costs;

C.     On the Third Cause of Action for Breach of Contract against Defendant NYU, damages in an amount in excess of the jurisdictional requirement of this Court and to be determined at trial, plus interest and costs;

D.     On the Fourth Cause of Action against all Defendants for Negligent Infliction of Emotional Distress, damages in an amount in excess of the jurisdictional requirement of this Court and to be determined at trial, plus interest and costs;

E.     On the Fifth Cause of Action against all Defendants for Intentional Infliction of Emotional Distress, damages in an amount in excess of the jurisdictional requirement of this Court and to be determined at trial, plus interest and costs;

F.    On the Sixth Cause of Action against Defendant NYU for Breach of Covenant of Good Faith and Fair Dealing, damages in an amount in excess of the jurisdictional requirement of this Court and to be determined at trial, plus interest and costs;

G.    Together with such other and further relief as this Court deems just and proper.

Dated: New York, New York
      May 8, 2019

**BARTON LLP**

By:_____
      James E. Heavey
      Michael C. Ward

711 Third Avenue, 14th Floor
New York, New York 10017
(212) 687-6262
jheavey@bartonesq.com
mward@bartonesq.com

*Attorneys for Plaintiff John Doe*

55