USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 2/5/2020

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN DOE,<br><br>      **Plaintiff,**<br><br>  −against−<br><br>NEW YORK UNIVERSITY, CRAIG JOLLEY, SAMUEL HODGE, COLLEEN M. MAEDER, MATHEW SHEPARD, MARY SIGNOR, JACQUELINE CORNELL, JASMINE WADE, DAISY TOMASELLI, JEFFREY METZLER, and JOHN DOES 1 THROUGH 10,<br><br>      **Defendants.** | 1:19−cv−00744 (ALC)<br><br><br>**OPINION AND ORDER** |

**ANDREW L. CARTER, JR., United States District Judge:**

## INTRODUCTION

Plaintiff John Doe, a male student enrolled at New York University's ("NYU") Tisch School of the Arts, was accused of violating NYU's Sexual Misconduct, Relationship Violence, and Stalking Policy ("the Policy") by allegedly having non-consensual sex with Jane Roe, a female student at NYU. Initially, John Doe was found to have violated the Policy and was disciplined. Subsequently, John Doe appealed and was cleared of any misconduct. Now, John Doe brings suit against Defendants, NYU, Craig Jolley, Samuel Hodge, Colleen M. Maeder, Matthew Shepard, Mary Signor, Jacqueline Cornell, Jasmine Wade, Daisy Tomaselli, Jeffrey Metzler, (collectively, the "Defendants"), alleging the Defendants conducted the investigations and adjudicative proceedings against him in violation of federal and state law. John Doe asserts the following claims against NYU only: (1) violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.* ("Title IX"); (2) breach of contract; and (3) breach of

the covenant of good faith and fair dealing. Doe asserts the following claims against all

Defendants: (1) violation of the New York State Human Rights Law ("NYSHRL"); (2) negligent

infliction of emotional distress; and (3) intentional infliction of emotional distress. Presently

before the Court is Defendants' motion to dismiss Plaintiff's Amended Complaint for failure to

state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons

set forth below, the Defendants' motion is **GRANTED**.

**BACKGROUND**

Unless otherwise indicated, the following facts are drawn from Plaintiff's Amended

Complaint, and are taken as true for the purposes of this motion to dismiss.

**I.     NYU's Sexual Misconduct Policies and Procedures**

The Policy defines prohibited sexual misconduct and applied to investigations and

disciplinary proceedings at NYU at the time of Jane Roe's complaint. Amend. Compl. ¶ 61, ECF

No. 21. Pursuant to the Policy, "non-consensual sexual intercourse" is defined as "having or

attempting to have sexual intercourse with another individual (i) by force, threat of force, or

coercive conduct; (ii) without affirmative consent; or (iii) where that individual is incapacitated."

*Id.* ¶ 65. The policy defines "affirmative consent" as "a knowing, voluntary, and mutual decision

among all participants to engage in sexual activity." *Id.* "In evaluating whether affirmative

consent was given," the Policy states

> consideration will be given to the totality of the facts and circumstances, including but
> not limited to the extent to which a Complainant affirmatively gives words or actions
> indicating a willingness to engage in sexual activity; whether a reasonable person in the
> Respondent's position would have understood such person's words and acts as an
> expression of consent; and whether there are any circumstances, known or reasonably
> apparent to the Respondent, demonstrating an incapacity to consent.

*Id.* ¶ 66. Additionally, under the Policy, incapacitation "is defined as the inability, temporarily or

permanently, to give consent because an individual is mentally and/or physically helpless, being

2

involuntarily restrained, asleep, unconscious, or unaware that sexual activity is occurring." *Id.* ¶ 67. It further clarifies that "[w]here alcohol or other drugs are involved, incapacitation is a state beyond drunkenness or intoxication." *Id.* Lastly the Policy includes a "Students' Bill of Rights" which states "all students have the right to . . . participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be hearing." *Id.* ¶ 68.

In addition to the Policy, at the time of Jane Roe's complaint, the "Reporting, Investigating, and Resolving Sexual Misconduct, Relationship Violence, and Stalking Complaints Against Students," (hereinafter "the Procedures"), set forth the procedures for the investigation and adjudication of Title IX and sexual assault claims at NYU. Under the Procedures, the Director of the Office of Student Conduct and Community Standards ("OSC") and NYU's Title IX Coordinator are responsible for administering the Policy. *Id.* ¶ 64. During the investigations of the underlying incident, Defendant Jolley was the Director of the OSC at NYU and Defendant Signor was NYU's Title IX Investigator. *Id.*

The Procedures provide that upon the receipt of a complaint, the responsible officers are required to "take immediate and appropriate steps to investigate or otherwise determine what happened and work to resolve the matter promptly and equitably." *Id.* ¶¶ 72-73. The Title IX Investigator is required to

> notify and meet with all parties separately (e.g., the Complainant, the Respondent, and identified witnesses) and . . . gather other evidence and information relevant to the determination as to whether or not a Policy violation has occurred. . . . At the conclusion of the Investigation, the Investigator will prepare a draft Investigation report, without findings, that summarizes the information gathered. Both the Complainant and the Respondent will be given the opportunity to review the draft Investigation report, submit any additional comment or information to the Investigator, and identify any additional information or witnesses. The Investigator will designate a reasonable time for review and response.

*Id.* ¶¶ 86, 109. The Procedures indicate that investigations are generally "completed within forty-five days from the date of the initiation of the Investigation,"[1] but "[t]his timeframe may be extended for Administrative Resolution and also may be extended for good cause."[2] *Id.* ¶ 126.

Following the conclusion of the investigation, investigators must then determine "whether there is 'sufficient evidence,' to be considered by an adjudicator." Defs.' Ex. C at V. This determination "is not a finding as to whether a Policy violation has occurred, is not an ultimate credibility assessment of the parties and/or witnesses (if applicable), nor is it a 'charging' decision for purposes of an adjudication of the matter (if applicable) . . . ." *Id.* Instead, the determination "solely addresses the issue of whether a reasonable fact-finder (i.e. the person serving as the Adjudicator at the hearing) *could* determine that there is sufficient evidence to support a finding that a violation of the Policy has occurred." *Id.*

Additionally, the Procedures provide that "a hearing will [typically] be held within sixty days of the initiation of the Investigation" unless good cause exists, and notice is provided to the parties. Amend. Compl. ¶ 101. Should a hearing occur, NYU is required to select an administrator to adjudicate the hearing; said adjudicator must have relevant training and experience and "must also be impartial and free from bias or conflict of interest." *Id.* ¶ 103.

## II.   The Incident

John Doe and Jane Roe met in 2016, during the fall semester of their freshman year at NYU. *Id.* ¶ 52. They resided on the same floor of an NYU dormitory and occasionally socialized.

---

[1] The Amended Complaint states investigations are typically completed in 35 days, however, the Policy states 45 days. Amend Compl. ¶ 126.

[2] Good cause is defined: "as necessary to ensure the integrity and completeness of the Revised Investigation, to comply with a request by external law enforcement, to accommodate the availability of witnesses, to account for NYU breaks or vacations, to account for complexities of a case, including the number of witnesses and volume of information provided by the parties, or for other legitimate reasons." *Id.* ¶ 207. "Any extension of the timeframes, other than for Administrative Resolution, and the reason for the extension, will be shared with the parties in writing." *Id.*

*Id.* On March 17, 2017, around 9:00 p.m., Jane Roe and her friend, E.G., who is not an NYU student, attended a party at R.A.'s dorm room, where Jane Roe was drinking. *Id.* ¶ 54. Jane Roe left the party to meet up with a male friend, W.C., but she returned to the R.A.'s dorm about 40 minutes later. *Id.* Then, Jane Roe claims she was escorted back to her dorm room by R.A. and E.G. *Id.*

At 10:44 p.m., Jane Roe messaged John Doe through the Facebook Messenger application. *Id.* ¶¶ 54-55. John Doe did not respond to the message right away because he was out at a bar with his friend from out of town, W.M. *Id.* At approximately 2:00 a.m., John Doe and W.M. arrived at the residence hall and encountered Jane Roe in the elevator. *Id.* ¶ 56. At that time, John Doe observed Jane Roe to be "fully conscious," speaking normally, and walking without assistance. *Id.*

At 2:37 a.m., John Doe responded to Jane Roe's Facebook message from earlier that night, and they exchanged additional messages. *Id.* ¶ 57. John Doe believed the conversation was coherent and properly punctuated. *Id.* Eventually, John Doe asked Jane Roe if she wanted to meet in the study room inside their residence hall and Jane Roe agreed. *Id.* When they got to the study room, John Doe and Jane Roe engaged in some consensual sexual activity, including kissing and oral sex. *Id.* ¶ 59. Then, John Doe asked Jane Roe if she wanted to have sexual intercourse and, according to John Doe, Jane Roe agreed to have sexual intercourse in the study room. *Id.*

On March 27, 2017, John Doe contacted Jane Roe, "to ask if she was upset by the encounter in the study room." *Id.* ¶ 60. Jane Roe indicated that "she felt like John Doe had taken advantage of her." *Id.* John Doe claims he was shocked by her response because he perceived Jane Roe's statements and actions on the night of the incident to be indicative of "a mutual desire

to engage in prolonged sexual activity." *Id.* John Doe apologized to Jane Roe and indicated he believed their encounter to be consensual. *Id.*

### III.    NYU's Investigations and Hearings

#### a.  Jane Roe's Complaint and NYU's First Investigation:

On February 18, 2018, Jane Roe filed a complaint with NYU Title IX investigators, alleging John Doe sexually assaulted her on the night of March 17, 2017 by having sexual intercourse with her when she was allegedly too intoxicated to give consent. *Id.* ¶ 3. NYU's Title IX Investigators, Defendants Hodge, Cornell, and Tomaselli, investigated Jane Roe's complaint. *Id.* ¶ 77. First, Defendants interviewed Jane Roe. *Id.* ¶¶ 78-80. Then, on March 22, 2018, Defendant Signor, emailed John Doe asking him to meet to discuss "allegations that [he] may have engaged in prohibited misconduct in violation" of the Policy. *Id.* ¶ 81. Defendants Cornell, Hodge and Tomaselli conducted two separate interviews of John Doe, one in person on April 13, 2018 and one by phone on May 3, 2018. *Id.* ¶ 82. Although both Jane Roe and John Doe had identified witnesses that may have relevant information to the Incident, Defendants did not interview any other witnesses. *Id.* ¶¶ 86-91.

On June 11, 2018, Defendants Hodge, Cornell, and Tomaselli submitted their First Investigative Report to Jolley and Signor. Jane Roe and John Doe had the opportunity to view the First Investigative Report, to submit edits and additional information, and to identify additional witnesses. Defs.' Ex. C at 8. Jane Roe provided three videos from the night of the Incident and John Doe provided additional information and a response to Jane Roe's videos. *Id.* The Defendants issued their determination, finding there was sufficient evidence for an adjudicator to determine whether John Doe violated the Policy and referred the matter to the OSC. Defs.' Ex. C at 9.

6

### b. NYU's Second Investigation

On July 24, 2018, Defendants Hodge and Wade issued a supplemental report to Defendants Jolley and Signor (the "NYU Investigation Supplemental Report"). Amend. Compl. ¶ 96. Per the NYU Investigation Supplemental Report, Title IX investigators were instructed to interview three additional witnesses: R.A., W.M., and E.G. *Id.* ¶ 97. R.A. refused to be interviewed, and according to Plaintiff, W.M. and E.G. provided information that discounted Jane Roe's account of the alleged incident. *Id.* ¶ 97. Nonetheless, Defendants determined there was sufficient evidence to proceed to a sexual misconduct hearing. *Id.* The second investigation was not completed until about five months after Jane Roe's filed her initial complaint. *Id.* ¶ 100.

### c. The First Sexual Misconduct Hearing

The first sexual misconduct hearing took place on August 22, 2018, and the Director of NYU's OSC, Defendant Jolley was the adjudicator. *Id.* ¶¶ 101-02, 104. At the hearing, Defendant Hodge provided a summary of the investigation conducted by his office. *Id.* ¶ 110. Jane Doe testified as to her account of the Incident and was questioned by the adjudicator. *Id.* John Doe's attorney was not permitted to question Jane Roe; instead, he was directed to provide written questions to the adjudicator for consideration. *Id.* John Doe then gave his account of the Incident and answered questions from the adjudicator. *Id.* In addition, W.M. and E.G. testified via Skype. *Id.*

Defendant Jolley found that John Doe had committed a sexual assault in violation of the Policy by a preponderance of the evidence. *Id.* ¶ 113. As a result, the Defendants imposed the following sanctions against John Doe: (i) a suspension for five semesters; (ii) a declaration that John Doe would be a persona non grata at NYU during the term of his suspension; (iii) a notation placed on his academic transcript; (iv) the requirement that John Doe submit to a reenrollment

process as a condition for returning to NYU; and (v) the requirement that John doe have no contact with Jane Roe (either directly or by third parties) during the remainder of his enrollment at NYU. Defs.' Ex. E at 5, 10. In rendering his decision, Defendant Jolley stated he imposed harsh sanctions on John Doe because of his "apparent failure to recognize the impact and harm caused by his conduct." *Id.* at 5. Defendant Jolley also wrote that his decision was motivated by the fact that John Doe's encounters with Jane Roe prior to the Incident "had consisted only of occasional text messages and a single encounter for about twenty minutes that occurred some five months earlier" and that "[t]hey had never had any discussion or behavior to suggest romantic or sexual interest and had never engaged in any physical intimacy prior to this night." *Id.* at 4.

### d. Appeal of the First Sexual Misconduct Hearing

John Doe appealed Defendant Jolley's Decision to an Appeal Panel, alleging NYU failed to "investigate equitably material facts probative of the Complainant's alleged intoxication, which are material procedural matters in fairly determining this matter and, worse, breaches of NYU's responsibilities under Title IX." Amend. Compl. ¶ G(1). On October 1, 2018, the Appeal Panel issued a Sexual Misconduct Appeal Panel Decision, concluding that there was not substantial evidence to support Jane Roe's alleged incapacitation as defined by the Policy. *Id.* ¶ G(2). The Appeal Panel also found that NYU's Title IX Investigators failed to interview witnesses "who may have evidence that is highly probative of [Jane Roe's] level of intoxication prior to her sexual encounter with Respondent prior to the hearing." *Id.* ¶¶ G(4), G(6). The Appeal Panel instructed the Title IX coordinators to further investigate and stayed the disciplinary sanctions imposed on John Doe. *Id.* ¶ G(5).

### e. NYU's Third Investigation

During the third investigation, Defendants interviewed approximately seven additional witnesses that had not previously been interviewed. *Id.* ¶ 127. On November 27, 2018, Title IX Investigators, Defendants Cornell, Hodge, Tomaselli, and Wade issued a new "Investigation Summary Report" to Defendant Jolley, in which they determined there was "sufficient evidence" to be considered by an adjudicator as to whether John Doe violated NYU Policy. *Id.* ¶ 128.

### f. The Second Sexual Misconduct Hearing

On January 2, 2019, NYU notified John Doe that it conducted further investigation and that a second sexual misconduct hearing would be held on January 28, 2019. *Id.* ¶ 149. NYU advised John Doe that the second hearing would be *de novo* and take place before an external arbitrator, Judge Jane Cutler Greenspan, a college and University Title IX adjudicator and former sex crimes prosecutor. *Id.*

At the second hearing, two additional witnesses, E.G. and W.M., testified via Skype. *Id.* ¶ 151. Judge Greenspan issued a decision in which she found by a preponderance of the evidence that John Doe was not responsible for a sexual assault under the Policy. *Id.* ¶ 152. Jane Roe appealed Judge Greenspan's decision. *Id.* John Doe opposed the appeal. *Id.* ¶ 154. On March 6, 2019, the Appeal Panel issued a Sexual Misconduct Appeal Panel Decision, affirming that John Doe was not responsible for a sexual assault of Jane Roe. *Id.*

### IV.  Public Pressure and Criticism Facing NYU

Between August 15, 2018 and August 16, 2018, a female NYU student posted on social media, alleging NYU failed her as a victim of sexual assault by declining to sanction two male students for alleged nonconsensual sex. *Id.* ¶ 135. According to Plaintiff, the post was distributed to at least 1,000 people and other women commented on the posts, indicating their support and

outrage. *Id.* Additionally, on October 20, 2018, The New York Post published an article with the headline "Hundreds of sex misconduct incidents reported at Cornell, NYU" and reported that 100 sexual misconduct complaints were made in the first five months of 2018. The article quoted a NYU spokeswoman as stating that "our students feel more comfortable coming forward to file these kind of reports." *Id.* ¶ 136.

## V.    Procedural History

On January 25, 2019, during the pendency of the second misconduct hearing, Plaintiff filed his initial complaint against Defendants. In addition, Plaintiff requested a preliminary injunction enjoining Defendant NYU from (1) adjudicating Plaintiff's responsibility for an alleged violation of NYU's Policy; and (2) taking any action to preclude Plaintiff from enrolling in courses or for pursuing his baccalaureate degree. Plaintiff also requested pre-hearing discovery. Following, an Order to Show Cause hearing, the Court denied Plaintiff's requests. After NYU cleared Plaintiff of any misconduct, Plaintiff filed an Amended Complaint, including additional factual allegations. Defendants then filed a pre-motion conference letter concerning their anticipated motion to dismiss, which outlined the arguments included in the instant motion. The Court subsequently held such a conference and provided Plaintiff an opportunity to amend his Amended Complaint; however, Plaintiff declined to file a second amended complaint.

## LEGAL STANDARD

When considering a motion to dismiss under Federal Rules of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Moreover, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Id.* 663.

## DISCUSSION

### I.    Title IX

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Because Title IX prohibits . . . subjecting a person to discrimination on account of sex, it is understood to 'bar[ ] the imposition of university discipline where gender is a motivating factor in the decision to discipline.'" [3] *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). In evaluating Title IX claims, courts consider the principles governing claims under Title VI and Title VII. *See Yusuf*, 35 F.3d at 714.

---

[3] The Court notes that while gender and sex have different definitions, for efficiency purposes—namely because precedent cited throughout this opinion refers to the terms interchangeably—the use of gender in this opinion refers to biological differences between males and females.

"Unlike Title VII, however, Title IX claims may not be predicated on a 'disparate impact' theory." *B.B. v. The New Sch.*, No. 17 CIV. 8347, 2018 WL 2316342, at \*4 (S.D.N.Y. Apr. 30, 2018). Rather, Title IX claims require evidence of intentional discrimination. *Id.* (citing *Alexander v. Sandoval*, 532 U.S. 275, 280, (2001)). A Plaintiff must therefore show "the defendant discriminated against him [or her] because of his [or her] sex; that the discrimination was intentional; and that the discrimination was a 'substantial' or 'motivating factor' for the defendant's actions." *Prasad v. Cornell Univ.*, No. 5:15-CV-322, 2016 WL 3212079, at \*14 (N.D.N.Y. Feb. 24, 2016); *see also B.B. v. The New Sch.*, 2018 WL 2316342, at \*4.

Generally, a plaintiff may challenge university disciplinary proceedings by brining two types of Title IX claims—claims of erroneous outcome or selective enforcement. *Yusuf*, 35 F.3d at 715. Under an erroneous outcome theory, a plaintiff claims that he or she is "innocent and [was] wrongly found to have committed an offense" because of his or her sex. *Id.* By contrast, under a selective enforcement theory, a plaintiff claims "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.* In this case, Plaintiff solely brings a Title IX claim under a theory of selective enforcement. *See* ECF Nos. 21, 40; *see also* Amend. Compl. ¶ 167. Hence, to survive a motion to dismiss, Plaintiff must show: 1) similarly situated female students at NYU were treated differently during investigations and disciplinary proceedings concerning sexual assault; and 2) the Defendants' had the requisite discriminatory intent.

The Second Circuit has recently held that the *McDonnell-Douglas* burden-shifting framework governs the pleading standard for sex discrimination under Title IX.[4] *Columbia*, 831

---

[4] For discrimination claims under Title VII, a Plaintiff must show "(1) that she is a member of a protected class, (2) that she was qualified for the position she sought, (3) that she suffered an adverse employment action, and (4) can sustain a minimal burden of showing facts suggesting an inference of discriminatory motivation." *See Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015) (citations omitted). Only then, has she "satisfied the prima facie

F.3d at 56; *see also McDonnell Douglas Corp v. Green,* 411 U.S. 792, 802 (1973); *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019) ("Because it is often difficult to obtain direct evidence of discriminatory intent, we employ a 'burden-shifting framework' (commonly identified by reference to the Supreme Court case from which it derives, *McDonnell Douglas Corp. v. Green*) to 'progressively sharpen[ ] the inquiry into the elusive factual question of intentional discrimination.'"). Accordingly, at the motion to dismiss stage, "allegation of facts supporting a minimal plausible inference of discriminatory intent suffices as to this element of the claim." *Columbia*, 831 F.3d at 55. This reduced pleading standard "entitles the plaintiff to the temporary presumption of *McDonnell Douglas* until the defendant furnishes its asserted reasons for its action against the plaintiff." *Id.*

Here, the Defendants primarily argue Plaintiff's Amended Complaint should be dismissed because Plaintiff fails to identify a single instance in which NYU treated a similarly situated female differently than it treated Plaintiff. Although Plaintiff concedes that he has not demonstrated that similarly situated females were treated differently, his central argument is that at the motion to dismiss stage, it is sufficient to only plead facts supporting a minimal plausible inference of bias on account of sex.

### A. *Plaintiff's Failure to Allege NYU Treated Any Similarly Situated Female Students Differently is Fatal*

Plaintiff's claim that in light of *Columbia* it is only necessary to plead a minimal inference of sex bias to survive a motion to dismiss is without merit. In fact, the Second Circuit expressly stated, "a complaint under Title IX . . . *is sufficient with respect to the element of discriminatory intent* . . . if it pleads specific facts that support a minimal plausible inference of

---

requirements [to establish a discrimination claim] and a presumption of discriminatory intent arises in her favor, at which point the burden of production shifts to the employer, requiring that the employer furnish evidence of reasons for the adverse action." *Id.*

such discrimination." *Columbia*, 831 F.3d at 56 (emphasis added); *see also Menaker*, 935 F.3d at 30; *Yusuf*, 35 F.3d at 713 (emphasis added) ("In order to survive a motion to dismiss, the plaintiff must specifically allege the events claimed to constitute intentional discrimination *as well as* circumstances giving rise to a plausible inference of racially discriminatory intent."). In other words, a minimal inference of discrimination only satisfies the element of discriminatory intent and not the other elements needed to successfully plead a discrimination claim. Consistent with this understanding, following *Columbia*, courts in this circuit have consistently dismissed selective enforcement claims absent allegations "that a school treated similarly situated members of the opposite sex—that is, members of the opposite sex facing comparable disciplinary charges—differently." *See Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397, 415-16 (N.D.N.Y. 2019) (dismissing Title IX selective enforcement claim because the plaintiff did not "allege facts to make it plausible that a woman who was similarly accused of sexual assault received treatment disparate to his."); *Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 403-404 (W.D.N.Y. 2017) ("In this case, the complaint fails to include any allegations that female students were treated differently . . . [a]ccordingly, the selective enforcement theory is inapplicable to this case.").[5]

  In addition, Plaintiff contends it would be unfair to dismiss the Title IX claim at this stage since information on how NYU enforces the Policy and the Procedures is confidential and therefore could only be revealed through discovery. The Court finds this argument unavailing.

---

[5] Plaintiff's additional argument that he need not provide a specific instance of similarly situated female students being treated differently because it is sufficient to allege that he was treated less favorably than Roe in the investigations and hearings is also meritless. Not only does this argument incorrectly interpret the pleading standard, as indicated above, but also it misapplies the law. *See Doe v. Colgate Univ.*, No. 5:15-CV-1069, 2017 U.S. Dist. LEXIS 180267, at *35-36 (N.D.N.Y. Oct. 31, 2017) (quoting *Columbia*, 831 F.3d at 57) ("[E]vidence of bias against the accused in sexual misconduct hearings does not equate to bias against men."); *see also B.B. v New Sch.*, 2018 U.S. Dist. LEXIS 80068, at *21 (S.D.N.Y. Apr. 30, 2018) ("the allegation that the accused are 'invariably male' fails to support a minimal plausible inference of gender bias for reasons other than the viability of disparate impact.").

"A plaintiff who has failed adequately to state a claim is not entitled to discovery." *Main St.*

*Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 567 (2d Cir. 2016) (citing *Iqbal*, 556 U.S.

at 686). Accordingly, Plaintiff has failed to satisfy the first element of a selective enforcement

claim. Although this failure is fatal to Plaintiff's Title IX claim, and therefore dismissal can be

predicated on this reasoning alone, for purposes of completeness the Court will address the

second element.

   B.  *Plaintiff Additionally Fails to Sufficiently Plead Discriminatory Intent*

       As indicated above, to satisfy the second element of discriminatory intent at the pleadings

stage, a Plaintiff must allege "specific facts that support a minimal plausible inference of []

discrimination." *See Columbia*, 831 F.3d at 56; *see also Menaker* 935 F.3d at 30. In the context

of selective enforcement claims, a plaintiff must allege facts "suggesting that gender bias was a

motivating factor" for initiating disciplinary proceedings against him or her. *Yusuf*, 35 F.3d 709.

The Second Circuit's decisions in *Columbia* and *Menaker*, despite involving erroneous outcome

claims, are instructive in determining whether Plaintiff's allegations support an inference of bias

on account of sex.

       In *Columbia*, the Second Circuit vacated a district court's dismissal of an erroneous

outcome claim under Title IX, in which the complaint alleged Columbia University was

motivated by sex bias in its investigation and discipline of a male student accused of sexual

assault. 831 F.3d at 48. The plaintiff argued that the element of discriminatory intent was

satisfied by his allegations that Columbia University conducted a flawed investigation and that

the school was under substantial public and internal criticism for how it handled female students'

sexual misconduct complaints against male students. *Id.* at 56–58. The Second Circuit

determined that although plaintiff's allegations regarding flaws in Columbia University's

investigations "support the inference of bias," they did not satisfy the element of discriminatory intent because "they do not necessarily relate to bias on account of sex." *Id.* at 57. However, the Second Circuit found plaintiff's allegations that Columbia University was under public pressure gave rise to an inference of sex bias. *Id.* In reaching this conclusion, the Second Circuit relied on both the extent of the pressure and the investigators' knowledge of the criticism. *Id.* at 59.

Similarly, in *Menaker,* the Second Circuit vacated a district court's dismissal of a complaint that alleged Hofstra University violated Title VII by discriminatorily firing an employee, on the basis of sex, in response to complaints of sexual harassment. 935 F.3d at 26. The Second Circuit concluded that the complaint "alleg[ed] circumstances that provide at least minimal support for an inference of discriminatory intent" by relying on the two factors it identified in *Columbia. Id.* Specifically, the Second Circuit identified the combination of a "clearly irregular investigative and adjudicative process" and public pressure on a university concerning its handling of female students' complaints of sexual assault against male students, could support an inference of sex bias. *Id.* at 34. Although the Second Circuit declined to define the standard for a "clearly irregular investigative or adjudicative process," it made clear that the factors it identified in *Columbia* provide guidance: (1) "if the evidence substantially favors one party's version of a disputed matter, but an evaluator formed a conclusion in favor of the other side (without an apparent reason based in the evidence)"; or (2) if decision-makers chose "to accept an unsupported accusatory version over that of the accused, and declined even to explore the testimony of the accused witnesses." *Id.* (citing *Columbia* 831 F.3d at 57).

Here, Plaintiff argues he has sufficiently pled discriminatory intent for three primary reasons. First, Plaintiff contends that the Defendants' investigation and adjudicative proceedings against him were clearly irregular. Second, Plaintiff asserts that NYU was under public pressure

for the way it handled previous sexual assault. Third, Plaintiff argues that he was treated more

unfairly than Roe in the investigation and adjudicative proceedings. In response, the Defendants

argue that Plaintiff's Amended Complaint neither alleges clear irregularities nor sufficient public

pressure to support an inference of bias on account of sex.

   i.   **Plaintiff Fails to Establish that NYU Engaged in a "Clearly Irregular Investigative or Adjudicative Process"**

   Plaintiff identifies many apparent departures from the Policy and the Procedures in

NYU's investigation and proceedings against him as indicia of sex bias against Plaintiff. First,

Plaintiff contends the Defendants failed to interview several witnesses with exculpatory evidence

during the first investigation. However, the Defendants declined to interview witnesses identified

by John Doe *and* Jane Roe. It therefore cannot be said that this failure was indicative of bias on

the basis of sex because it affected both the female complainant and the accused male student.

Furthermore, the Defendants ultimately interviewed all of the identified witnesses during the

second and third investigations.

   Second, Plaintiff claims that the Defendants violated the Procedures by not providing him

with adequate notice of his alleged misconduct before they interviewed him. This argument is

unavailing. Neither the Policy nor the Procedures have a pre-interview notice requirement.

Rather the Procedures only require a pre-hearing notice. In Plaintiff's opposition he also alleges

that the Defendants did not give him notice that incapacitation would be an issue before the

second sexual misconduct hearing. This argument fails. As a preliminary matter, Plaintiff's

Amended Complaint does not include facts related to notice of the incapacitation issue. For this

reason alone, the Court can dismiss this claim. However, even if his complaint had included such

facts, the investigative reports indicate that incapacitation was an issue to be resolved by the

adjudicator. Amend. Compl. ¶ 87; Defs.' Ex. C, at 2-5; Defs.' Ex. D, at 2-4. Plaintiff's notice

argument consequently is also without merit.

Third, Plaintiff alleges that the Defendants did not have "sufficient evidence" to proceed

to either the first or second sexual misconduct hearings. Specifically, Plaintiff argues that there

was no evidence to support that Jane Roe was incapacitated, such that she could not consent and

instead there was evidence to support Jane Roe was able to consent. As previously mentioned,

the standard for sufficient evidence is "whether a reasonable fact-finder (i.e. the person serving

as the Adjudicator at the hearing) *could* determine that there is sufficient evidence to support a

finding that a violation of the Policy has occurred." Defs.' Ex. C. at V. The Court finds that a

reasonable fact finder could find there was sufficient evidence to conduct a misconduct hearing

because Jane Roe's and John Doe's accounts of the incident differed significantly and there was

evidence that Jane Roe was intoxicated on the night of the incident.

Fourth, Plaintiff argues the Defendants failed to exercise neutrality in numerous instances

throughout the investigations and hearings. For example, Plaintiff identifies Defendant Jolley's

statements concerning Plaintiff's lack of empathy and remorse as evidence of sex bias. As this

Court has held previously, statements such as these are gender neutral. *See B.B. v. New Sch.*,

2018 U.S. Dist. LEXIS 80068, at *19-20 (concluding the university's Disciplinary Review

Panel's statement that "Plaintiff lack[ed] in empathy and therefore [was] not credible" was

gender neutral). In addition, Plaintiff argues that in finding sufficient evidence the Defendants

failed to be neutral by both assuming Plaintiff's guilt and ignoring exculpatory evidence. *See,*

*e.g.,* Amend. Compl. ¶¶ 94, 109. However, as the Procedures explain, a determination of

sufficient evidence "is not a finding as to whether a Policy violation has occurred, is not an

ultimate credibility assessment of the parties and/or witnesses (if applicable), nor is it a

'charging' decision for purposes of an adjudication of the matter (if applicable) . . . ." Defs.' Ex. C. at V. Furthermore, as indicated above, there was evidence to support Jane Roe's version of the account—namely, evidence supporting the fact that she was intoxicated on the night in question.

Plaintiff's remaining contentions regarding the investigations and hearings were "minimal irregularities," and are insufficient to infer sex discrimination. *See Menaker,* 935 F.3d at 34, n.50 ("[W]e emphasize that our standard requires clear irregularities to raise an inference of bias. Variations among employers, even among universities, are expected, and minimal irregularities (absent other indicia of bias) do not suffice to suggest discrimination."). For instance, Plaintiff alleges that NYU violated the Procedures because the investigations took longer than 35 days. However, Plaintiff fails to address whether NYU had good cause to extend the investigation. Further, even if the NYU did not have good cause to extend the length of the investigation, the fact that the investigation took longer than normal does not on its own give rise to an inference of bias on the basis of sex. *See Iscenko v. City of NY,* 2017 U.S. Dist. LEXIS 103869, at *14 (S.D.N.Y. July 5, 2017) (quoting *Harris v. Niagara Mohawk Power Corp.,* 252 F.3d 592, 599 (2d Cir. 2001)) ("[T]he mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent.").

Finally, it is worth noting that to the extent there were deficiencies, albeit ones that did not arise to the level of clear irregularities, the Defendants cured any deficiencies in its initial investigations and the first sexual misconduct hearing by conducting a second, *de novo* hearing before a neutral arbitrator. In that hearing, Plaintiff was cleared of any wrongdoing and no sanctions were imposed against him.

ii.    **Plaintiff Fails to Establish NYU was Subject to Sufficient Public Pressure and Criticism**

In support of his argument that NYU faced public pressure that suggests discriminatory intent based on sex, Plaintiff identifies a couple of social media posts from a female NYU student, who criticized NYU for failing to impose sanctions on two male students accused of sexual assault. According to Plaintiff, the post was distributed to 1,000 people and other women commented on the post. *Id.* Unlike, *Columbia* and *Menaker,* this is insufficient to support "even a minimal plausible inference of gender bias" because Plaintiff does not allege that these posts were circulated to the press or that the Defendants' were aware these posts existed. *See Menaker*, 935 F.3d at 33 (citations omitted) ("[P]ress coverage of sexual assault at a university does not automatically give rise to an inference that a male who is terminated because of allegations of inappropriate or unprofessional conduct is the victim of [sex] discrimination."). Further, Plaintiff alleges that on October 20, 2018, the New York Post published an article with headline: "Hundreds of Sex misconduct Reported at Cornell, NYU." This article does not provide support that NYU was under public pressure or criticism concerning its handling of sexual misconduct. In fact, as Plaintiff notes, the article included a statement from an NYU spokesperson who stated, "our students feel comfortable coming forward to file these kind of reports." Amend. Compl. *Id.* ¶ 136.

Next, Plaintiff reasons the occurrence of the #MeToo movement on NYU's campus in October 17, 2017 supports an inference of bias based on sex. However, as Plaintiff acknowledges, the #MeToo movement occurred on college campuses across the country, and therefore, does not provide sufficient support that NYU specifically was under public pressure. Furthermore, the #MeToo movement took place several months before Jane Roe even filed her complaint.

Finally, Plaintiff argues that NYU followed the guidance issued by the Department of Education's "Dear Colleague letter," which encouraged schools to minimize the burden on complainants and focus on victim advocacy. This argument also fails because at the time of the complaint, investigations and hearings, the letter had already been withdrawn. Although the Second Circuit in *Menaker* concluded that the public pressure does not have to amount "a particular level of severity," Plaintiffs' allegations are conclusory and insufficient to establish a "plausible inference of sex discrimination" considering he neither establishes that NYU was under public criticism during the pendency of the underlying investigations and proceedings nor does he establish Defendants' knowledge of the purported criticisms. In light of Plaintiff's failure to establish both that similarly situated female students were treated differently in investigations and adjudicative proceedings concerning sexual misconduct and his failure to allege facts supporting an inference of bias based on sex, Defendants' motion to dismiss is **GRANTED** as to Plaintiff's Title IX claim.

## II.      State Law Claims

Since the Court finds Plaintiff's only federal claim—the selective enforcement claim under Title IX— should be dismissed, the Court declines to exercise supplemental jurisdiction over the state law claims. *WorldStarHiphop, Inc.*, 2011 U.S. Dist. LEXIS 123273 at *16-17. *See also Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (where, as here, all federal claims have been eliminated, concerns of "judicial economy, convenience, fairness and comity point towards declining to exercise jurisdiction over the remaining state-law claims.").

## III.      Leave to Amend

Pursuant to Federal Rules of Civil Procedure 15(a)(1) a party may amend its complaint once without leave of court up to 21 days after the service of either a responsive pleading or

various Fed. R. Civ. P. 12 motions. *See* Fed. R. Civ. P. 15(a)(1). After that time has expired, any amendment requires the consent of the opposing parties or leave of court. *See* Fed. R. Civ. P. 15(a)(2). Rule 15(a)(2) states "the court should freely give leave when justice so requires." *Id.* However, it is ultimately "within the sound discretion of the court whether to grant leave to amend." *John Hancock Mut. Fife Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994) (citing *Foman*, 371 U.S. at 178). Where "the moving party has unduly delayed or acted in bad faith, the opposing party will be unfairly prejudiced if leave is granted, or the proposed amendment is futile" courts in this circuit have denied motions to amend a complaint. *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 452 (S.D.N.Y. 2016). "In addition, the Second Circuit has consistently stated that district courts may deny leave to amend when plaintiffs request such leave in a cursory sentence on the last page of an opposition to a motion to dismiss, without any justification or an accompanying suggested amended pleading." *In re Ferrellgas Partners, L.P., Sec. Litig.*, No. 16 CIV. 7840, 2018 WL 2081859, at *20 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 127 (2d Cir. 2019).

Here, Plaintiff concludes his opposition to Defendants' motion to dismiss by briefly requesting leave to amend his Amended Complaint should the Court dismiss this action. Plaintiff does not provide any details as to the additional allegations to be included in such a second amended complaint. Furthermore, after Defendants identified certain deficiencies in his pleadings, Plaintiff was provided an opportunity to submit a second amended complaint but declined to do so. *See* Defendants' Pre-Motion Conference Letter, ECF No. 23; Joint Status Report, ECF No. 32; *see also City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014) (determining a denial of leave to amend was appropriate where Plaintiffs already had an opportunity to amend their complaint and likely were on notice of

deficiencies in their pleadings). Accordingly, Plaintiff is **DENIED** leave to amend his Amended Complaint.

**CONCLUSION**

For the forgoing reasons, the Defendants' motion to dismiss the Amended Complaint in its entirety is **GRANTED.** Additionally, Plaintiff is **DENIED** leave to amend his Amended Complaint.

**SO ORDERED.**

Dated:      **February 5, 2020**
                 **New York, New York**

                                                    **ANDREW L. CARTER, JR.**
                                                   **United States District Judge**